IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT
OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF KOOTENAI

--oOo--

| | |
|---|---|
| AMANDA RIEKENA,<br>Petitioner,<br>vs.<br>ZACHARY RIEKENA,<br>Respondent. | Case No. CV28-24-8457 |

# TRANSCRIPT OF PROCEEDINGS

(Transcribed from Digital Media)

MOTION TO CONTINUE
MOTION FOR SANCTIONS
STATUS CONFERENCE
MOTION TO AMEND

AT: Kootenai County, Coeur d'Alene, Idaho

ON: February 2, 2026

BEFORE: The Honorable Mayli Walsh, Magistrate Judge

APPEARANCES:

For the Petitioner: Valiant Law
By: Safa M. Riadh, Esq.
924 E Sherman Avenue
Coeur d'Alene, Idaho 83814

For the Respondent: Bolton Law, PLLC
By: Kourtney L. Jones, Esq.
111 N 7th Street, Suite 3386
Coeur d'Alene, Idaho 83814

February 2, 2026

T R A N S C R I B E D   P R O C E E D I N G S

--oOo--

THE COURT: Mr. Riekena is present with counsel Ms. Jones, and Ms. Riekena is present with counsel Mr. Riadh.

MR. RIADH: Good morning, Judge.

THE COURT: Good morning. We have quite a few motions we're going to deal with here today. Oh, I'm sorry, Ms. Riekena. This computer screen is right blocking my view of you.

MS. RIEKENA: You're okay.

THE COURT: I was going to say they upgraded our system, but I don't think -- I don't think I'll use the term upgrade. I think that we -- not upgraded. What did we do, Wanda? Retrofitted?

THE CLERK: It's changed.

THE COURT: It was changed. So we've been struggling a little bit with the -- with some of the changes here, so my apologies. We have three motions, as I understand it: A motion to continue, a motion for sanctions, and then finally a status conference.

MS. JONES: And a motion to amend pleadings.

THE COURT: And a motion to amend. Thank you very much.

MS. JONES: Yes.

THE COURT: And a motion to amend. So quite a few things to address here today. The three issues that I think are somewhat interrelated in preparation -- in preparing for hearing here today would be the motion for sanctions, the motion to continue, and the motion to amend.

And I guess my first question for counsel is, the motion for sanctions and the -- it seems to me that there may be just an impasse in some of the items being available by the time our February trial date rolls around.

Does that impact counsel's position on the motion to continue and same with the motion to amend? So does the motion to amend, if granted -- and as I understand, the motion to amend somewhat comports with sort of the procedural position of the parties to this point. Does that change whether we should have our trial in February or not? And I'll have -- you can have the floor, Ms. Jones.

MS. JONES: Your Honor, the motion to amend is to make sure that Respondent's position is clear to the Court going to trial and also in our request for default in our motion for sanctions. And I understand procedurally the Court very likely won't consider that,

but I did want to put it in front of the Court if in the case we do move forward to trial and our sanctions do contemplate going forward to trial on just our positions and what has been established in our disclosures, and so we would recommend that if we do move to trial, that the motion to amend is granted and therefore that's our position going to trial.

In addition to that, although unlikely, I'm aware that we request the default with our motion to amend being considered, and then what our position today is that if a default is not granted, that we do wish to proceed to trial with the motion for sanctions being considered and a motion to amend considered.

THE COURT: Understood. Thank you, Ms. Jones. That helps me understand your position. Mr. Riadh.

MR. RIADH: Thank you, Your Honor. We'd ask the Court to continue the trial. As the Court has seen, this case has lasted some time. Dad was originally in the position of having the custody issues. Mom is now in this position and has essentially flip-flopped their positions.

I know this case is a lot older than I've been representing Ms. Riekena, but they -- I genuinely believe without a doubt that she's been hacked and she has genuine issues. I'm not seeing any information from

her to have me doubt her and to doubt her ability to gather information.

We did supplement on January 23rd an attempt to just continue to provide information. Ms. Riekena and her mother had been working really hard. I received maybe 12 of these binders this morning full of information that we need to go through, scan, organize, and be able to disclose properly.

I think the Court should grant the motion to amend the pleadings. I think the Court should grant the motion to continue and let us get back on attempting to get on track to get this matter resolved.

As to the motion for sanctions, Judge, you know, there has to be some willful desire not to comply and -- with the Court's order, and I don't think that's the situation here. I think Ms. Riekena has every desire to comply.

We've had -- I've talked to multiple witnesses that her home is a dead space. You can't get phone calls there. You can't make phone calls out. She's been in contact with multiple law enforcement agencies in an attempt to figure out what's going on in her life and why she's been hacked like this, and I just don't think continuing litigation at this time and just barreling into trial is going to be either in the best

interest of the children or the parents in the long run, so we are asking for that continuance, Judge.

We're also asking for just more time at the end of the day not to grant the motion for sanctions. She has provided more information as of this morning. We just need time to get through it and disclose it properly, and I just don't think it would serve the terms of justice to go to trial [inaudible]. Thank you, Judge.

THE COURT: I guess what I'm not understanding is, so some of the material, as I understand them, don't relate to the -- say, for example, financial documents or financial material that may pose a difficulty. So if one is hacked, I agree if you're hacked and you're not able to get into your bank accounts or maybe even on your phone, the apps that carry your financial information.

I understand that position, that it could even relate to, for example, the Social Security Administration, getting information from the Social Security Administration, because if you lose your password, it's really hard to get into those -- into those websites.

That said, for example, the doctors' notes and reports from request for production No. 10, that just

seems like it should be able to be supplied. And I guess the other concern that I have is, I'm not seeing in the response sort of, well, Judge, there's some issues with being able to access these accounts, and these are the steps that we've undertaken to address the hacking of the accounts, and so I have some broad sort of understanding that STDs were issued, but other than that, a little bit in the dark in terms of what efforts have been made to sort of get this information to Ms. Jones because we need to have this information for trial.

MR. RIADH: If I may just have a moment.

THE COURT: Sure. Ms. Jones, did you wish to respond?

MS. JONES: Yes, Your Honor. I would just want to go through first my motion for sanctions, and then I'll go through my motion to amend pleadings, so here's where we're at. There was no objection lodged. There was no inability to provide these documents.

At the last hearing, was notified that there was a discussion about subpoenas. My office has not received a notice of subpoena for these documents. So this continued statement that because she was hacked she cannot provide these documents to me is starting to lose its grasp on this case. It's continuous excuse after

excuse.

We were provided a report for hacking, and within this report it states that they worked on remedying these issues. So, again, and then we add onto that we can't communicate because there's hacking. We can't do this because there's hacking. We can't do that because they're hacking. When you can go directly to your bank and you can ask for statements to be pulled by showing your ID, this is not an excuse that could be presented to the Court recently.

I am -- we have been litigating this specific issue since May of 2025. We've been trying to get documents, trying to work with Ms. Riekena. And again and again and again, we keep hitting these roadblocks and then an excuse after that once we are required to file a motion.

We are still waiting for documents and requests for production No. 1, 3, 5, 10. Those were provided in their supplemental responses, but they were deficient. They -- in an attempt to respond, the attempt to respond was barely met even the lowest level of standard, Your Honor.

The rest of the request for production that weren't answered at all or given a supplemental response, which is two, seven, eight, nine, 11, 12, 13,

14, 15, and 16, no supplemental response was provided for those despite that being a part of the order.

I attached an Exhibit 1 to the motion that identifies that we have received less statements than what have been requested. I outlined it for the Court as an attachment. Again, the attempt to comply is miniscule at best.

I have attempted to confer with counsel even after the implementation of this current order and no assurance to provide additional documentation have been provided until this morning when we walk in and -- that there's a statement that there's multiple binders that have been provided. Too little, too late, Your Honor. That's my stance coming into this hearing today.

My client has gone through a lot of expense litigating over these issues, and we're looking at getting reimbursed for those. Under the Rule 417, states, shall provide fees in this instance. And addition to that, we are now past noncompliance with mandatory disclosures and discovery. We have now been in violation of a court order, and that's what we're coming here today to ask, and we're asking for response -- or Petitioner's pleadings to be struck, we're asking for a default, and we're asking for fees. And so whatever the Court finds appropriate in terms of

sanctions today, that's what we're requesting.

As for the motion to continue, again, the stance coming in here today, Your Honor, is too little, too late. We have already asked for a continuance back in July that was denied by this Court and it was objected to by Petitioner. She was ready to go to trial back in July despite the deficiencies that we outlined for this Court.

She continued to state that mandatory disclosures in discovery had been complied with. Our position this whole time is that they had not been. We needed additional time. Now we have gone through the hoops and the loops and the jumps just to get where we are today and still we don't have that additional information that we needed for this Court or to continue to trial in front of this Court.

And our motion to amend the pleading, Your Honor, is just to make sure that our pleadings are adjusted to the current status of the custody. Our original request to this Court was 50/50 custody, joint legal, joint physical.

Due to the actions that happened in October and the continued noncompliance with Court orders, continued noncompliance with coparenting, the anti-efforts is how I would describe them to get along

between the parties, and Mr. Riekena has gone to an extent of agreeing to new supervisors, agreeing to amended visitations and yet these are being met with now just bringing in supervisors that weren't even talked about before or threatening to cancel appointments for the girls for therapy, not taking the girls to physical therapy appointments during her parenting time.

So all of this in tandem is going towards Respondent's request for sole legal custody because it cannot happen. These parties cannot discuss things together, because if they are discussed, then Petitioner just goes ahead and does what she wants anyways, and that's the concern, is that with this motion to compel and the motion to amend, we're looking at a continued disrespect of these Court's orders.

And frankly, Your Honor, we are exhausted in financial disparity because of these continued efforts to bring these issues before this Court. And that is all I will say, Your Honor, to those two motions. I think that we can discuss the status conference after this. Thank you.

THE COURT: Thank you. Mr. Riadh.

MR. RIADH: Thank you, Judge. Judge, I hardly -- wholeheartedly disagree with the word disrespect. I don't think Ms. Riekena is trying to

disrespect this Court or counsel or her coparent in attempting to resolve these issues.

She is actively working on these things. I even have had struggles calling and getting ahold of her and not at her fault, I would say, because if I genuinely believed it was her fault, I wouldn't be standing here asking the Court for a continuance so I can continue to help her by asking the Court to let me out of this case because she didn't want to help herself, but this is not that type of situation.

She wants -- she's working through these issues. We're just asking for more time, Judge, and I understand that can be difficult. I'm -- these -- we've received -- I have -- they were dropped off this morning, so I barely looked at them this morning. I want to be honest with the Court. But we received a lot of documentation that we need to be able to supplement. We're asking to be able to supplement.

I think if the Court is going to go -- actually, before I say this, I should...

Judge, if the Court is -- you know, Ms. Riekena's position is please deny this motion for sanctions, please continue the trial, but understanding that there are issues and these are going to be ongoing issues, if the Court is considering entering some sort

of default or sanction that leads to a default, we'd ask the Court that only to default on assets and debts, and then continue the trial regarding custody so that the most important thing to the best interests of the children can be fully litigated and decided on its merits.

Other than that, I think Ms. Riekena falls on the mercy of the Court here in asking and requesting that she be provided this opportunity to get this information. She's been trying to supplement.

Again, I'm not one of those attorneys that if my client does nothing, I'm going to ask to withdraw, especially in this type of scenario, and she has not not done nothing. She's been attempting.

Part of the problem with being hacked is her devices, she can't -- she's not able to get any stuff. She's had to go through and print everything that she has, and then get it to me printed and not in an electronic. We've been trying to work through that.

I know the letter said that they're trying to remedy it, but that's what they're trying to do. They're trying to remedy it. They haven't been able to remedy it yet. And so, again, we just ask the Court to deny the order, allow -- to deny the motion for sanctions, to allow the pleadings to be amended, and to

continue out the trial. Thank you, Judge.

THE COURT: And so, Mr. Riadh, can you tell me what in terms of just -- let's just talk about the mandatory disclosures.

MR. RIADH: Yep.

THE COURT: Because that's kind of like the de minimis, the baseline. I'm understanding that they're still deficient, that they still have not been complied with. And can you tell me -- so from the time I entered the order on December 12th, 2025, to today, what efforts have been undertaken to obtain -- let's just focus on the mandatory disclosures. So what efforts have been undertaken by Ms. Riekena to get that information?

And, Ms. Jones, maybe you can outline for me while they're discussing what you're still missing from the mandatory disclosures.

MS. JONES: Yes, Your Honor.

THE COURT: Because I don't think you outlined for that in the motion for sanctions. I think it was just generally not been at all replied to.

MS. JONES: Yes, it hasn't been supplemented since, I believe, May, but let me correct that if I am incorrect there. Since the initial disclosure, there is some supplementals. But the bank accounts specifically, we're looking at the USAA checking account ending in

0315. We haven't received a statement since January of 2025.

USAA savings account, same thing: We haven't received a statement since January of 2025. We haven't received any documentation for her unsecured loan through USAA. With that being said, in her filings, she also stated that there's an ICCU account with a $30,000 debt.

What she has provided us recently was additional statements for the credit card under Barclay's. We haven't received additional documentation of Apple Cash and Apple Pay statements, although we do have one document from April of 2025 confirming that she has these accounts.

We received Venmo statements from August till current but nothing before that. Same for Cash App: We received one statement for December of 2025, and that was it. So everything else is needed on those.

THE COURT: Just on the bank accounts?

MS. JONES: Those are just the bank accounts, yes, Your Honor.

THE COURT: But in terms of the other mandatory disclosures?

MS. JONES: We haven't received any proof of income.

THE COURT: No proof of income, okay.

MS. JONES: The last statement was made in Court that she was unemployed, but we have heard otherwise throughout these proceedings, but we wouldn't be able to see because we haven't seen her bank accounts or any documentation that she currently has a job.

THE COURT: Has she provided W-2s or any other tax information to you?

MS. JONES: No. The parties had discussed refiling their joint tax return for 2025, and when it came to actually doing that, Ms. Riekena refused to allow an amendment to happen and provide documentation. So, no, we have not seen any of that.

THE COURT: Mr. Riadh.

MR. RIADH: Judge, USAA, Apple, and Cash App don't have physical locations for Ms. Riekena to be able to walk into. These are -- she's explaining to me these are all part of the identity theft, so her -- on the phone is not -- where she has made efforts on the phone to get this information is not working.

She states she does not have an ICCU account, so you don't have an ICCU account, okay. So we -- again, she's trying on those. The W-2 tax information for 2025 is coming out now. She's indicating she believes that it's in her mother's PO box, so she'll be

getting that to me later today and providing whatever tax information she has. I don't think -- is there missing '24, '23 tax information, or is it just '25?

MS. JONES: Yeah, we haven't received '24 either.

MR. RIADH: You haven't received -- do you have '24?

MS. JONES: Or her tax return she filed, or the tax return that was filed.

MR. RIADH: So part of the problem is anything that she saved electronically, right, is corrupted, and she's not able to get to it.

THE COURT: And so I guess my question, just returning back to my question --

MR. RIADH: Yes, Judge.

THE COURT: -- is what efforts were made to get this information since my order was entered --

MR. RIADH: Yes, Judge.

THE COURT: -- in [inaudible]?

MR. RIADH: So she's physically gone -- sorry, what she's reporting to me is she's physically gone around to medical offices and gathered that information. That's part of the stuff that got dropped off into my office.

She has tried calling again under my

instruction to call USAA and to call Apple and to call Cash App, but that has not yielded anywhere. I believe Apple and Cash App were already subpoenaed by Mr. Riekena, so I'm not sure if there was a response to --

MS. JONES: No.

MR. RIADH: I've seen a subpoena.

MS. JONES: We didn't receive a response to it.

MR. RIADH: You didn't receive a response --

MS. JONES: No.

MR. RIADH: -- from it -- from your subpoena?

MS. JONES: Correct.

MR. RIADH: Okay. And essentially they're all notorious for not responding. That's part of the problem that we have here. So the USAA, we can send another subpoena, but subpoena's -- not by my end, Judge, but on the subpoena's end, those cost funds and my client is struggling financially, right? So if you send a subpoena to a bank, you're going to get a bill for the work that they did to get the information out, so that also is creating a problem there.

THE COURT: So she called USAA?

MR. RIADH: She called -- they don't have a physical -- USAA doesn't have a physical location,

Judge.

THE COURT: Okay. And so what correspondence has she had with USAA? I'm sure they -- during the call they likely mailed her some information or some requests.

MS. RIEKENA: We could send them a subpoena.

MR. RIADH: We can just send a subpoena, but they would have to respond to a subpoena --

MS. RIEKENA: They'll respond to a subpoena, but because --

MR. RIADH: -- but the subpoena's going to cost.

MS. RIEKENA: -- there's an open fraud investigation on my account, they can't provide anything without a subpoena.

THE COURT: Okay. So when was the subpoena sent to USAA? From December --

MR. RIADH: No subpoena has been sent, Judge, because I'm concerned about -- we send a subpoena, we're going to get a bill from USAA, and I don't think Ms. Riekena has the funds to pay for a subpoena bill.

I have an outstanding bill at this time that I've just been working with her on, right? Essentially, I'm basically working pro bono right now because she doesn't have the funds. I'm keeping -- Judge, I want to

be clear, I'm keeping track of my time. I am billing her, but at this moment, right, she doesn't have the funds to pay me, and so I don't know how I can ethically send out a subpoena and that I know my client can't pay when the bill for the subpoena comes in, and it just creates an unfortunate double-edged sword in this scenario.

THE COURT: Ms. Jones, are you not concerned about going to trial without this additional financial information?

MS. JONES: I'm only concerned -- excuse me, sorry. I'm only concerned about going to trial without this financial information if Petitioner's allowed to put on her case.

If everything we present to the Court on the financial issues is essentially defaulted and my client's position is taken as proven, then I'm okay with moving forward to trial.

Again, my position, Your Honor, is that we have been trying to do this for a significant amount of time, and I don't think an additional continuance is actually going to resolve anything.

THE COURT: Understood. Thank you. I just -- you know, I reviewed sort of the life of this case and Mr. Riadh is correct. There have been a lot of changes

over time in this case. This case was filed by Ms. Riekena back in December of 2024, so this has been pending a really long time.

My concern is that just -- it's not been demonstrated to the Court's satisfaction that there have been reasonable efforts to get this USAA information, and these -- and we're just talking about the mandatory disclosures at this point, because we had pretty lengthy conversation about the mandatory disclosures and just that that was really the floor, that was just the base of what needed to be disclosed prior to trial, and that had just not been complied with.

And so back in December when we had our hearing entered, the order to compel, hoping that that would -- and again, we're just talking about the mandatory disclosures, and just hoping that that would get the ball rolling in December to get this information exchanged so that we can have a full and fair and robust hearing on the merits at trial at least with regards to the mandatory disclosures and the financial information.

And again, I'm not understanding why it's taken so long to just get the copy of the records, the medical records, so these are -- now we're going beyond the mandatory disclosures, but the request for production. But I mean, this could have happened any

time in December, any time, you know, when I set my deadline in terms of the order for disclosure, and certainly I -- like I said, I'm sympathetic to the idea of being hacked and then financial information just being compromised online.

But again, I'm not receiving any information like, Judge, here is the deadline, here is what we've done to remedy the situation, here is evidence that we've been in communication with these organizations to ensure that this information can be provided because the Court is waiting for it. Counsel for Mr. Riekena is waiting for this information. And just left with this sense that this could go on forever, we just will never get this information because there's just -- there's no end in sight in terms of when we'll get this information.

And so whether I continue this trial, I don't think that's going to change. If we set the case in March, I have no indication that this financial information is going to be provided. If I do continue the trial, we'll just be in the same exact position because I'm not being told again there's an end in sight to this situation, that this is just ongoing -- an ongoing problem, and we just can't -- unless we subpoena USAA for these records, we're just not going to get

them, and we can't afford to subpoena USAA.

I don't even know how much that would be. I mean, has anyone called and asked, hey, USAA, if we subpoena you, can you waive these fees for these records? My client is indigent. We need these records as part of a court order. I mean, just no efforts where I have some faith that we're going to get this stuff, we're going to get this information, and we're going to have it ready in time for trial, whether we have trial in February or we have trial at some later date.

Rather, this continued issue of, well, we just don't have it; we just can't get it. And would note that not only is it required by the rule, but there was a court order requiring that this information be disclosed.

And at this time, again, I can't find that with respect to -- I think with respect to Apple Cash and the apps on the phone, and the Cash App, you know, I think that could pose difficulty -- I would just have to be accepting that the hacking is so extensive that she's not able to access that information, and I accept that. But in terms of the USAA, just the lack -- and how important that information is, ultimately.

And it's just not me saying or Ms. Jones saying it. The rule requires the exchange of that

information, that we don't have that, and so left with this situation where we just don't have this information. There's no end in sight to this problem, and this is brought as a motion for sanctions after we've had a motion to compel.

And so given those circumstances, would grant the motion for sanctions, would enter default. I am always loathe to enter default as a sanction, because, again, trial is meant for that adversary process where we challenge information, challenge evidence. But with relation to the financial situation, would enter default with respect to the financials, the parties' financials, so debt, property, tax.

MS. JONES: Your Honor, just one point of clarity.

THE COURT: Yes.

MS. JONES: So we have amended the inventory of property and schedule of debts and those have continued to be disclosed to opposing party. Is that going to be considered in the default, because the original inventory of property and schedule of debts that was attached to the petition has been substantially updated during the discovery process and as things have transpired. I can file it with the Court as a proposed order and the Court can take a look if that is an

option.

THE COURT: Well, tell me why it should be included.

MS. JONES: Your Honor, discovery of the value of the home has changed. The value of accounts have changed. The property that was considered, some of them have been added or they have been confirmed as separate property since then. They have -- it's all outlined and it's been continually disclosed. I have the most recent combined version of the inventory of property and schedule of debts that I could provide.

THE COURT: But in terms of the sanction --

MS. JONES: Yes.

THE COURT: -- in terms of the default, help me understand how there's some relation between entering the default as a sanction for failure to comply with the Court's order relating to discovery and mandatory disclosures and the property inventory.

MS. JONES: Because we have continuously disclosed on our end all of the information that's required to support the numbers, and we have received nothing from the other side.

THE COURT: Then that should be included.

MS. JONES: Thank you.

THE COURT: So --

MR. RIADH: Well --
THE COURT: -- I was looking at the specific paragraph, so paragraph of the amended answer and counterclaim, paragraph 13 -- I'm sorry, 18, paragraph 19, paragraph 20, paragraph 21, 22, 23, 24. I can't imagine 25 and 26 were going to be disputed in any event.
MR. RIADH: Judge, I'm so sorry, could you say those paragraph numbers again?
THE COURT: Sure.
MR. RIADH: Thank you.
THE COURT: So I'm reading from the amended answer and counterclaim.
MR. RIADH: Okay.
THE COURT: So default would be granted on paragraphs beginning 18, 19, 20, 21, 22, 23, 24, 25, and 26. And again, as I indicated, I think 24, 25, and 26, and 23, I think that that would just simply not be disputed. That relates to indemnification, revocation of beneficiary, so would enter default on that as well. Twenty-seven, which relates to retirement accounts, and that will be subject to the default. If you'll prepare the order and the default, Ms. Jones.
MS. JONES: Yes.
THE COURT: Would permit amendment of the

answer and counterclaim, and then I don't think we've robustly heard your motion to continue, Mr. Riadh, so would permit you to do that.

And so understanding that in terms of the request to continue, there will still be a contested hearing as it relates to custody, and I guess components of support, child support, since it is interrelated to custody, but in terms of your request to continue the trial.

MR. RIADH: Judge, this case is not ripe for trial, especially on custody at this time. There is just -- there's a lot of moving parts that are happening with these children. As you can see from the status letters, these parents are completely on not even close to the same page as to what their problems are, and, as Ms. Jones put it, they can't coparent or communicate.

We have been dealing -- since I've walked into this case with Ms. Riekena, it's been -- you know, it's been essentially a fire after fire after fire, and I haven't had enough time to adequately either work through these -- the issues that we've been dealing with and also prepare her for trial on a substantial custody matter.

I think it's in the best interests of the children that when Ms. Riekena appears for trial, her

attorney's fully prepared to be able to move forward in an adequate way and be able to present the evidence adequately.

There's -- again, I just got 12 files from Ms. Riekena this morning, and that -- and I'm not saying, you know, that should be all -- the main reason for the continuance. But, Judge, again, when we're asking -- the Court's asked to look at the merits of the case and to make an interest in the best interest of the children, we're just asking for a full opportunity to be able to be adequately ready for trial.

Now that the issues have substantially narrowed, essentially, I think getting through whatever discovery problems there are on both ends because we're going to eventually -- we had to meet and confer, mandatory disclosures were updated, but discovery was not updated, so there are some compliance problems, and we're going to be moving forward with our own motions.

But again, at the end of the day, I think especially when we're talking about trial related to care of children, it should be a full and adequate trial, and I think the way to effectuate that is with a continuance. Thank you, Judge.

THE COURT: Thank you. And, Ms. Jones.

MS. JONES: Thank you, Your Honor. This case

has been pending, as you stated on the record already, for a substantial amount of time. Counsel did appear towards the end, as we approached trial, knowing when the trial date was.

Ms. Riekena has had plenty of time to get ready for trial considering all the issues before them. I do want to make clear to the Court that mandatory disclosures were supplemented this month, along with our supplemented discovery responses. So to my understanding, I have not been notified of any further deficiencies as going forward to trial.

THE COURT: On your end?

MS. JONES: On our end.

THE COURT: So you've made additional mandatory disclosures, and they've not been -- it's not been indicated to you that those disclosures that you've made are deficient?

MS. JONES: Correct.

THE COURT: Okay.

MS. JONES: Yes.

THE COURT: Just so I understand. Thank you.

MS. JONES: Yep. Yep. Absolutely.

MR. RIADH: And that is correct, Judge, I won't disagree with that.

MS. JONES: Since the original -- since the

last time we were in court, counsel has had 75 days to get prepared for moving forward and has not done so, apparently, based on statements here today.

So I would just like the Court to know that my client is ready to move forward to trial. He has been ready to move forward to trial, and he's maintained compliance with all of the Court orders we are subject to and moving forward to trial, and it would substantially financially put him in peril if we had to continue this once again because then we are doing a secondary trial prep with all the pretrial compliance on top of what we have already done thus far. Thank you.

THE COURT: Thank you.

MR. RIADH: Judge, if I may, just --

THE COURT: And last word, yes.

MR. RIADH: Thank you, Your Honor. The Court did just amend the pleadings and amended the pleadings in a way where, you know, he went from joint legal, joint physical custody, week-on/week-off schedule to sole legal custody, and that issue on its face alone should allow this Court to allow us to have a continuance, because now it is a substantially different type of trial than what had been anticipated for the entire life of Ms. Riekena's case through her prior counsels and through -- so I would ask, again, with the

amendment, that the Court allow the continuance.

THE COURT: Well, I think that we were all somewhat aware that things were changing and very dynamic in terms of the requests. And frankly, I don't know if the amendment -- and I'm not of the position that the amendment would require a continuance in the sense that I see this more as a courtesy, in fact, because Ms. Jones could ask to amend her requested relief at the time of trial, really. And so appreciate that the motion to amend was filed.

Requested was -- well, request was made of the Court, and even going so far as to highlight or make bold or, you know, differentiate in color those specific areas that Ms. Jones was modifying her request as part of the amended answer and counterclaim, which not everybody does that. And so here just procedurally, the case has been going on for a long time, and I just can't imagine that either party wants this to drag on any longer. It's been pending for so long.

And it -- you know, frankly, just understanding what I understand from the most recent submissions from Mr. and Mrs. Riekena, how this -- just how the children are doing, how         and         are doing, it seems like we need to get this going. We need to get this done.

And I don't say that because I think it should be rushed. I say that because I think you guys need closure in your lives. The girls just need to know what's happening and just have stability and closure moving forward. And a lot of the issues, a lot of disputes that are brought up in your pleadings for the status conference today really are trial issues, right?

I mean, there are really issues that either they happened or they didn't. For example, this argument that, well, Ms. Riekena knew that the girls had physical therapy and here is how -- why she knew; she knew because I attached the appointment schedule.

And I don't think there's any dispute that they were missed or late physical therapy appointments, and so really the purpose of trial is to get to the bottom of things and find out what the truth is, you know, with opportunity to cross-examine and opportunity to present evidence, and I think that's just -- frankly, that's just where we are. It's just needing to try this case and get to the bottom of things and find out what the best schedule would be for and moving forward.

And so I'm going to deny the request to continue the trial. This matter has been pending for a really long time, you know, and I know things have

changed significantly over that time period, but I have no -- there's no indication that things wouldn't continue to change, frankly, the longer we just wait to institute some kind of appropriate schedule for the children.

My hope is that there can be some time to sit down and come to agreement, and I know I've expressed that hope multiple times throughout the life of this case, that I was hopeful that we could just come to some kind of agreement. And I think in going back through the record today and last week in preparation for hearing today, I think we even tried a settlement conference on the record. I don't know, Ms. Jones, if you remember that.

MS. JONES: I do.

THE COURT: It was back in August we tried to all get together and have a conversation about how can we resolve this case, how can we get things going so we don't have to come in to trial. What's best for the girls and move forward, and I don't -- that was not fruitful; just couldn't come to agreement.

And then I ultimately entered my -- I think after that time, I entered -- that was the time that I entered my fourth temporary order right after that settlement conference, which was basically like shared

custody. I think it was 4-3-3-4, essentially.

And then I want to say it was just a couple of months -- so that was in August, and then it was October that we had this issue involving the emergency ex parte temporary order with Ms. Riekena, and so we've tried to resolve. It's just -- we've had [inaudible.]

MR. RIADH: Yes, thank you, Judge.

THE COURT: Just remind me, how old are and now?

MR. RIEKENA: Ten and eight. ten. eight.

THE COURT: Ten and eight. And here's why I'm struggling a little bit, and I'll just be frank with the parties. There is a lot of trouble coparenting right now, and I think it's really easy to cast aspersions on both sides and just say, well, it's his fault or it's her fault.

And I think to effectively move forward, the mindset has to somewhat change in terms of, well, coparenting and coparenting communication is something that has to be worked on, and it's really a process, and so what I'm saying is that trial usually is always bad, and I -- I may have said that to you guys before, but -- and it's not bad for me because I like trial, and I don't think it's necessarily bad for the lawyers because

the lawyers like trial and they're good at trial, and we have two good lawyers who can put on a case, right? I have every confidence that Mr. Riadh can put on a good case. I have every confidence that Ms. Jones can put on a case. But trial's are usually not good for parents. It's expensive, but that's not the worst part of it.

I think the worst part of it is just the very sort of cruel discussion of things that at one point were intimate and private conversations that are then public and everybody hears about them, and they -- you know, it's like you've got strangers in the room talking about your personal life and your personal struggles, and I think that just poses real problems long-term for coparenting in the sense that in my experience, and it's not just anecdotal, but the evidence shows that people who can't resolve their cases short of trial tend to come back again and again and again because they just don't exercise that coparenting muscle, and so they just get stuck in this repeated situation of litigation because they can't solve the problems on their own with their own families.

And and are pretty young still, and that's a long haul until they're 19 of coming back to court repeatedly for litigation. And I only -- again, I only bring this up because the two of you

strike me as people who are very invested in the well-being of your children. I mean, just from looking at the affidavits anyway, you guys love your kids and you guys are going through all the effort and expense of trying to do the right thing for your kids.

And so, you know, I -- I will sit through this trial, of course, but I'm not sure that that is the best thing for you guys, and I would like to see you guys be able to come to some kind of agreement and resolution. Now that we have Mr. Riadh on the case, maybe that's more possible in discussions with Ms. Jones. Like what that would -- now that we have a default on the financial end of things, we can really just focus on the child support and the child custody, and maybe with assistance of counsel we can have -- because I want to say that when we had our settlement conference, I'm not sure that Ms. Riekena was represented at that time. And so maybe with the assistance of counsel, we can have some good conversation about what appropriate parenting looks like, and we can shortcut the expense of trial, because I think we have three days set?

MS. JONES: Two.

MR. RIADH: Two.

THE COURT: Two days. Maybe we can shortcut the expense of a two-day trial and come to some kind of

agreement.

MR. RIADH: Judge, my client's all -- very open to do a judicial settlement conference if we use maybe our first half day to try to attempt to resolve it through that.

THE COURT: Well, I'm not sure I'm willing to do that just because -- I mean, the only reason I'm -- the only reason I hesitate to use a trial day is because I think that if it breaks down, and we did have some difficulties last time, that if it breaks down, then we've sort of taken away that time for presentation of evidence. I -- but that said, we do have less to do --

MR. RIADH: Uh-huh.

THE COURT: -- in the sense that we have in terms of the financial aspect to it. Ms. Jones.

MS. JONES: I'm trying to think out my presentation, Your Honor, with custody. I don't foresee a multitude of witnesses being involved, and so if I can discuss with my client what that may look like and possibly using first half day, if the Court is open to that.

THE COURT: Okay. I'm going to ask the question, but I think -- I don't -- I might not want to know the answer to, but are and aware of this court proceeding? Do they know that court's

happening?

MS. RIEKENA: Yes.

MR. RIEKENA: Like right now, today?

THE COURT: Well, just in general.

MR. RIEKENA: No -- like in general, yeah. I do believe they know that --

THE COURT: Yeah.

MR. RIEKENA: -- yeah, we're going back and forth.

THE COURT: Have they expressed to you feelings about court?

MR. RIEKENA: To an extent. Like I know that they just know that we're trying to get to an end plan here, and they haven't, like, expressed major concern for -- because I guess what I'm getting at is like this is a place for Mom and Dad to come together and figure it out to where we're not coming in together and figuring it out outside of this and arguing in front of them and arguing stuff in front of them, which we don't want to do. So, yeah, they know, but I don't think that it's like distraughtful that they know that we're going -- coming here, if that's what you're asking.

MS. RIEKENA: My youngest said she wanted -- my girls said they wanted to talk -- they asked if you were like Judge Judy, because my grandma watches Judge

Judy, and I said, no, you don't yell and act like that in there, and then -- and so my girls were like, "Would we be able to meet the Judge? Would we be able to talk to her if she's not like Judge Judy?"

And I said, "I don't know. We can tell her that you want to, but I don't know."

MS. JONES: Your Honor, I think we would object to that notion.

MR. RIADH: Oh, I don't think she was actually posing that as an in-camera review or anything.

MS. JONES: Okay.

MR. RIADH: I think she was just talking.

MS. JONES: Okay.

MS. RIEKENA: My girls think that we're at Judge Judy. I had to clarify that you don't yell and stuff, like that's on Grandma's TV.

THE COURT: And, you know, sometimes people will ask me to talk to their children, and I don't -- I don't necessarily have a problem with that, but I do have some really strict rules about it in the sense that -- and sometimes people just don't agree to the rules, and then if they're not in agreement with the rules, we just don't do it.

But the rules are that the -- I ask the children the questions, how they're doing, how they're

feeling. Their wishes, of course, are one of the factors, but kids will often change their mind about things. I mean, one day they'll want to be with Dad, one day they want to be with Mom.

I mean, it really is just about understanding the children and understanding how they feel at each place. The rules that generally I put into place relate to the fact that the record would be sealed for all time for all purposes against both parties, so neither Mom nor Dad could ever hear the audio of the children unless they make some disclosure, right?

If there's some disclosure of abuse or neglect, of course, I -- as a mandatory reporter, we would have to report that. That's -- in the ten years I've been on the bench, that's never happened, but I have -- I give that caveat, but it would have to be closed for all times for all purposes to both parties, and it really is an -- and if I feel like the children have been prepared or script -- not scripted, but if they have been coached inappropriately, I have a pretty keen sense of that happening, and I just discontinue the discussion if I feel like there's been any sort of coaching.

Sometimes children feel like they want to give their side of the story. They know that proceedings are

happening, and it's been a really hard time for them, and they know their parents are going to court and fighting and -- and for some kids it's a -- it provides them relief to know they can come in and just talk and let the Judge know, meet the Judge. Let the Judge know kind of how they're feeling about things, and sometimes not.

Sometimes kids are too young to do that or too -- they lack maturity to do that, or it's not particularly helpful what they have to provide the Court. But just to let you guys know that's one of the sort of arrows in the quiver that the Court has, and I'm not alone with the child. I'm in with Madam Clerk.

I sit down at counsel table, but -- and I have had siblings come in and talk with me, so two kids at once come in and talk and just tell me about their lives, tell me what they're doing, what they do at Mom's house, what they do at Dad's house.

The one unique thing we have about, in this case is, we did have a Department of Health and Welfare investigation and the Department did go into both homes, so I do have some information about how the children interrelate with both their parents based on that investigation. But again, it's secondhand and so --

MR. RIADH: Judge, just a clarification

question on -- if I may, so that's essentially a on-the-record sealed from counsel and clients' conversation that the Court will use to fill in the factor but not really --

THE COURT: Yeah. And it's really tough because, you know, when I'm articulating my decision, I tell the kids, like, this is private conversation, and so I get a lot of really interesting and good information typically about their home circumstances in those conversations, and then I ask them permission, like, what can I share with your parents about what we've said today. And it's surprising what kids will want me to share with their parents.

I'll tell you right now, 90 percent of the time it's, I really want my mom and dad to stop fighting. I mean, 90 percent of the time, that's what they tell you: We want them to stop fighting. We just want them to get along. We don't want Mom to say bad things about Dad. We don't want Dad to say bad things about Mom. That's generally what I get in terms of what they want me to tell their parents, but then that helps me understand what their wishes may be in moving forward and if they feel safe.

But again, just an arrow in the quiver of tools that we have that kind of keep us out of adversary

trial arena, understanding that it's time for it to go to trial, it needs to go to trial.

So I'm happy to use some time for judicial settlement conference at the beginning of our -- the first day of our trial, and whatever information that the parties want to give to me. I think what will be helpful is if I just had a proposed parenting plan from both sides.

MS. JONES: Absolutely.

THE COURT: What that would look like moving forward.

MR. RIADH: Judge, we're just working through this issue really quick if that's --

THE COURT: Sure, [inaudible] fine.

MR. RIADH: Thank you.

THE COURT: I don't have any other hearings.

MR. RIADH: So just to -- I think -- I think we have an agreement on . Dad thinks is too young. Mom thinks that is going to get upset if gets to go and she doesn't get to go, and so that's kind of the dynamic. Maybe if we can have an agreement that, you know, just a little bit shorter with , and then -- and then --

MS. JONES: And -- sorry.

MR. RIADH: Go ahead. I'll let you speak.

MS. JONES: I think the consideration, Your Honor, is that is pretty traumatized with everything that's happened so far, and she's in counseling and she's working through having nightmares and things that have gone on, and so bringing her into this courtroom, I think my client's concern is that it's going to exacerbate those issues; whereas, the older child, she's -- she's voiced that she wants to have her voice heard.

You know, in my professional opinion, what I've seen is sometimes that can be more traumatizing when a kid is already kind of being brought in and out of these situations, so that was the initial consideration, but he's willing to allow the older child to come in, but with the younger one and the counseling considerations and all that, we don't want to see her digress --

THE COURT: Sure.

MS. JONES: -- in her progress.

THE COURT: Here what's I propose we do with that is, why don't you ask her.

MR. RIEKENA: Okay.

THE COURT: I mean, if you're okay with coming in and wants to go, that's great. If says no, I don't really want to do that. And

you can tell , she doesn't have to say anything if she doesn't want to, and she can just come and see the courthouse.

MR. RIEKENA: Okay.

THE COURT: And I mean, if you want to frame this as this is just your chance to -- the Judge wants to show you the courtroom.

MR. RIEKENA: Yeah.

THE COURT: Show you the courthouse. Sometimes I let the kids buzz the buzzer if there aren't too many people here and see what the courtroom looks like, and then talk to me about how they're feeling and how they're doing and how they feel in their respective homes, and that's it.

MS. JONES: If we were to agree, Your Honor, to both of the kids coming, what would the date look like when that would occur?

THE COURT: Are they -- they are not on break right now, right? So they -- you know, it would probably be after school sometime.

MS. JONES: Okay.

THE COURT: You know, like at a 4:00 o'clock so we're not pulling them out of school or pulling them away from extracurriculars. I don't want them to miss anything, yeah, and they would just come -- like I said,

they would just come in.

We'd put them on -- we just have Madam Clerk go on the record, show them the courthouse. And again, it would just be this is just a conversation with the Judge to let them know how you're feeling, and you don't -- if you want to share anything, but I would pose it as a question if they want to. And at this point, I -- if the question is asked, I would like Mr. Riekena to ask the question of the girls if they would like to come. And if they answer in the affirmative that they would like to come, we can try to accommodate it.

MS. JONES: Okay.

THE COURT: If they say, you know what, I just don't -- we're uncomfortable with that, that's okay too.

MR. RIEKENA: Okay.

THE COURT: Okay? I just want that -- I just want that to be a conversation coming from Mr. Riekena and just -- and just Mr. Riekena for right now.

MR. RIADH: Yes, Judge. Just for the record, my client's position is has expressed interest in coming as well.

THE COURT: Okay. And that's fine. And like I said, if she wants to come and just hang out, and I would prefer to have both girls together.

MR. RIEKENA: Yeah.

THE COURT: I find that it's a little stressful for them if they're separated and each come in at a separate time.

MR. RIEKENA: Yeah.

THE COURT: They would just be coming in together and checking out the courthouse and talking with the Judge.

MR. RIEKENA: Okay.

MR. RIADH: And just a clarification, please, is this something that we can -- if it's a yes from both sides --

THE COURT: Yes, then I'll need an order.

MR. RIADH: Yes.

THE COURT: An order that reflects the sealing of for all times, for all purposes, other than, you know, abuse. And then once I get that order, we can just have -- you can just email Madam Clerk, and we'll look for a date after school, a time and date that doesn't interfere with their extracurriculars.

MR. RIADH: Potentially before trial date?

THE COURT: Yeah, it will have to be before trial. Yeah.

MR. RIADH: Okay. Perfect. And then the only thing is, is, you know, whoever brings the children, I think the other parent should be able to be here to

bring them in and then both parents step away.

I just don't -- you know, these can be a little interesting when only -- you know, whether it's Ms. Riekena or Mr. Riekena that brings the children in, the other person should be able to say hi to them when they come in.

THE COURT: No. What's going to happen is whoever has custody on the day that this happens, they'll just bring them in together, and that will just minimize any, like, weird tension that might happen about coming into court.

We want to make it as stress free as possible, and really it's an opportunity for -- and this is going to sound a little strange, but it's an opportunity for the children to reclaim the narrative in the sense that they get to come in and they get to tell me what they want to do, and they get to be bosses for a minute, boss of this courtroom for a minute.

And I think that's -- sometimes that's important for children who are going through a lot of conflict in court. It's like this -- it's like this idea of something that happens far away that they have no control over, and sometimes being able to come in and see it dispels some of the concern. Being able to come in and talk with the Judge makes them feel a little bit

more empowered in the process.

But certainly I think you need to be informed and sensitive to the children, and if they say -- if they are fearful of it, absolutely not. We don't want that to happen at all. But if they feel, in fact, like, yeah, I really -- this would be empowering for me to go in and talk with that Judge and tell her, you know, what I'd like to see happen, that's great.

And like I said, I do this with some frequency, and I talk to kids a bit, and usually it's a very positive experience. And just from a selfish end, I always love to meet the children of the people that -- the families that I work with.

Yeah, so we'll leave that to you guys, and then we'll just leave this on for trial. I am going to modify the temporary order. I've reviewed carefully the submissions. They were lengthy. And I definitely -- I certainly, in reviewing the competing declarations, have some ongoing concerns. I think that the evidence seems to support at this juncture that Ms. Riekena is not fully honest about some of the communications between her and Mr. Riekena.

Specifically what I'm referring to is the physical therapy appointments. I think Ms. Riekena has put the school in kind of a difficult situation here by

just showing up, given the Court's temporary order. Certainly the communication has not been helpful between the parties.

You know, and I carefully reviewed the -- Our Family Wizard communications back and forth, and a little disappointed to just see some of the posturing in terms of just not -- just a lack of good communication here. The original -- the original reason why I put into place supervision for Ms. Riekena related to mental health stability -- and I didn't -- I didn't really get a lot of information about the mental health stability. I just got a lot of, like, digs back and forth about communication and about whether drop-off times change or not.

And that was the whole point, the whole concern with just having another family member or third party that was approved by both sides supervising was just to make sure that things were safe and that things were okay with Ms. Riekena's mental health stability, and I don't know if Ms. Riekena is still in counseling.

One of the issues was whether she was on mental health medications and whether those mental health medications were being continued, and I just didn't receive any information about that.

MR. RIADH: Judge, I can inform the Court.

THE COURT: Okay.

MR. RIADH: Ms. Jones was actually super kind. She gave me a call and gave me a heads up and said, hey, you know, when we have these status hearings, the Court expects an affidavit supplying this information. I've reached out to both Ms. Carter and Mr. Henzel to get updates. They're just -- they both couldn't her -- Ms. Carter can do it this week. Mr. Henzel can do it next week. That's the situation that we --

THE COURT: So is she presently still in counseling? You're still in counseling?

MR. RIADH: Yeah. If you don't mind, just directly --

THE COURT: Ms. Riekena, you're still in counseling?

MS. RIEKENA: Yeah. Mr. Henzel is -- he started his own practice in Post Falls, so he left where he was at, and I'm going -- I want to stay with my doctor, so he's been opening his new practice, which is why I couldn't get a letter from him, and then Ms. Carter, I couldn't --

MR. RIADH: Answer the question: Are you still in counseling?

MS. RIEKENA: Oh, yes. Yeah, I'm [inaudible].

THE COURT: And then are you still medication

compliant?

MS. RIEKENA: Uh-huh.

THE COURT: And then mental health medication compliant?

MS. RIEKENA: Yeah.

THE COURT: All right. And so I appreciate that. I appreciate that update. And I think that there has been -- and here's my perspective on the supervised visitation, and I was pretty clear that I wanted -- there were enumerated people that could supervise these visits, and if there weren't -- if there wasn't an agreement, it just couldn't happen unless there was some form of agreement, because we named, I think, Ashley, and then I want to say another person.

MS. RIEKENA: My mom.

THE COURT: And your mom, and then a third person that had to be agreed upon, and, you know, I think Mr. Riekena put it very well in a portion of his declaration, and that is, just someone that he could feel comfortable that they would reach out if there was a problem, right? Like if he -- if there was something concerning happening, that they would reach out and communicate with him and let him know, hey, come pick up the girls if there's a problem, and that was well taken. That was the whole purpose of it, was just because some

of the concern of the statements made and just some of the events that precipitated the emergency ex parte order required that fail safe here.

But instead, it's been a bit of a source of conflict, unfortunately, and so some difficulties with that. I think we're getting close to trial. I am going to order amendment of the order of -- essentially sixth temporary order.

It's going to remove the supervision component, so those visits will stay the same and same times just for that consistency at this point, but remove the supervision. However, Mr. Riekena is going to make -- is going to have decision-making authority with respect to extracurriculars, school and medical, as long as you provide releases. You're just going to have -- you're just going to have to make those decisions.

MR. RIEKENA: Yeah.

THE COURT: Exclusively on this sixth temporary order.

MR. RIEKENA: All right.

THE COURT: Just to ensure that those things are happening and the physical therapy is happening and the girls are getting into the activities they need to get into.

MR. RIEKENA: Yeah.

THE COURT: And we'll see how the unsupervised or without a supervisor present works, because again, that's just been a source of conflict. And at this point, I think Ms. Riekena has demonstrated some stability in terms of her mental health and the symptomatology.

There's some concerns, I know, that were outlined by Mr. Riekena in terms of the behaviors. Also included that there can be no consumption of alcohol, and I think that may have been in a previous temporary order that may have just disappeared over time, but no consumption of alcohol by either party during your parenting time or not, just ever at this point.

And if -- and I'm going to empower each side. If you believe that there's been consumption of alcohol, you can request testing. If you request testing, you got to pay for it on the front end. If it's positive for alcohol, the other side has to pay. If it's negative, then you get stuck with the cost, the requester gets stuck with the cost. So you got to pay for it -- request it, pay for it on the front end. You have got to get it done within 24 hours, because it's just -- there have been some violations of the Court orders here, the temporary orders, and that's just --

that's got to stop.

But I also don't want this to be a source of conflict in terms of the supervision, and I'm mindful of the reason why I ordered supervision to begin with, and that was because we had some concerns about Ms. Riekena's stability, mental health stability, and you demonstrated now that you can be safe around the girls, but certainly would encourage you, Ms. Riekena, that if you're feeling -- a really important part of coparenting is reaching out if you need the girls to go back to Dad's for whatever reason. And there really just shouldn't be any questions asked.

MR. RIEKENA: Yeah.

THE COURT: If Ms. Riekena reaches out and said, hey, can you pick up the girls, just, okay, pick up the girls.

Any questions about that sixth temporary order? And that will just be in place until we have trial. Mr. Riadh?

MR. RIADH: Just so -- Ms. Riekena's asking me to ask. Would the Court be willing to consider Sunday night as an overnight? I mean, we're talking about -- we're at nine hours per week right now, Judge. She's just --

THE COURT: No overnights at this time given

the circumstances. I mean, if I had -- if -- I think that if things were a little bit different in terms of the -- some of the violations of the Court's temporary order, I mean, I pretty clearly said the parties had to agree to a third party. They had to come up with some agreement -- not anybody could just be a supervisor, that I was hoping the parties could work together and that didn't happen.

I mean, if there had been some attempts to make that work in the sense that, you know, better communication, I might consider it. But given these circumstances, I'm loathe to just remove the supervision, but we got to make some steps forward here as we approach trial, so -- and try to minimize some conflict, and it seems like a reasonable way to reduce conflict and continue the visitations and see if that helps communications improve, and that's also the Court's thinking vis-a-vis Mr. Riekena making decisions as to extracurriculars and school and medical because that's also a source of conflict, and I'm just going to remove the conflict.

MS. JONES: Your Honor, we would request that Ms. Riekena does provide documentation of compliance with the counseling and the medication because of the concern of the dishonesty.

THE COURT: Yep, I think that's reasonable. I would like to see some kind of confirmation that counseling is still ongoing, and that -- Ms. Riekena is medication compliant.

MR. RIADH: And, Judge, I'll just -- I'll be frank, we've asked for those records to indicate those things. They may not come in time for pretrial compliance, so...

THE COURT: We'll just expect them as soon as you get them.

MR. RIADH: As soon as I get them, I will send them over. Thank you, Judge.

THE COURT: Yeah. And again, I think that if I had that information, and I had -- I didn't have violations of the Court's order in terms of the supervisor, I think that might be closer to us talking about overnights, but at this juncture, declining to do that.

Ms. Jones, will you prepare the sixth temporary order?

MS. JONES: Yes. Yep.

THE COURT: And if I didn't say it already, the testing would have to happen within 24 hours of the request.

MS. JONES: Yes, I did note that. Thank you,

Your Honor.

THE COURT: Anything else we need to address today from your perspective, Ms. Jones?

MS. JONES: Thank you, Your Honor. The order for default, I was going to just follow up on the fees portion of that request.

THE COURT: That would be granted.

MS. JONES: Okay.

THE COURT: And I think that's a mandate. It's a shall when it's ordered for sanctions. I don't think I have discretion as it relates to that.

Mr. Riadh, anything else we need to address today?

MR. RIADH: Judge, I'm just assuming the fees will go through the normal process of getting filed?

MS. JONES: I'll file an amendment.

MR. RIADH: Yeah.

MS. JONES: Yep.

THE COURT: All right.

MR. RIADH: And we'll reserve opportunity to object --

THE COURT: Yeah.

MR. RIADH: -- too.

THE COURT: Of course. So I will wait -- Madam Clerk will wait to get an email from you guys if

you want me to meet with and in camera; otherwise, we'll see you back the first day of trial and we'll use some time at the beginning to talk about maybe settlement short of a full robust two-day trial.

All right. Thank you very much. We'll be off the record.

MR. RIEKENA: Thank you, Your Honor.

(Recess.)

MR. RIADH: If we were to agree to move the pretrial memo to the 19th, would that be okay with the Court?

THE COURT: Is that okay with you?

MS. JONES: Yes, Your Honor. I just -- I know that the Court's the one that reviews those before trial, so I want to give the Court enough time.

THE COURT: Yeah, that's fine. If you guys want to do that, that's fine.

MR. RIADH: Thank you, Judge.

THE COURT: And if you come to agreement before then, you obviously don't have to submit it.

MR. RIADH: Yeah.

MS. JONES: Great. Thank you.

MR. RIADH: Thank you. Yeah, I'll shoot you an email.

MS. JONES: Okay. Great, Safa.

MR. RIADH: Thank you, Judge. May I be excused?

THE COURT: Yeah, of course.

MR. RIADH: Thank you.

(Matter adjourned.)

STATE OF IDAHO ) CERTIFIED COURT REPORTER'S
) TRANSCRIPTION CERTIFICATE
COUNTY OF KOOTENAI )

I, KERI VEARE, do hereby certify:

That I am a notary public of the State of Idaho, that I am a Certified Shorthand Reporter of the State of Idaho, License No. 675,

That I transcribed, to the best of my ability, the foregoing proceeding from an electronic recording, and that the above and foregoing transcript is a full, true, and correct record of said proceeding, except where indicated as inaudible.

I FURTHER CERTIFY that I am not interested in the outcome of said matter nor connected with or related to any of the parties of said matter or to their respective counsel.

Dated this 8th day of March, 2026.

Keri Veare

KERI VEARE
Court Reporter/Transcriber
IDAHO CSR 675, CRR, RPR

**MR. RIADH: [60]** 2/7 4/16 7/12 11/23 14/5 16/15 17/6 17/10 17/15 17/18 17/20 18/7 18/10 18/12 18/14 18/24 19/7 19/11 19/18 26/1 26/8 26/11 26/14 27/10 29/23 30/14 30/16 34/7 36/23 37/2 37/13 39/9 39/12 41/25 43/12 43/15 43/17 43/25 46/19 47/9 47/13 47/20 47/23 50/25 51/2 51/12 51/22 55/20 57/5 57/11 58/14 58/17 58/20 58/23 59/9 59/18 59/21 59/23 60/1 60/4
**MR. RIEKENA: [17]** 34/10 38/3 38/5 38/8 38/12 44/22 45/4 45/8 46/15 46/25 47/4 47/8 53/18 53/21 54/1 55/13 59/7
**MS. JONES: [53]** 2/23 3/1 3/21 7/15 14/17 14/21 15/20 15/24 16/2 16/9 17/4 17/8 18/6 18/8 18/11 18/13 20/11 24/14 24/17 25/4 25/13 25/19 25/24 26/24 28/25 29/13 29/18 29/20 29/22 29/25 33/15 36/22 37/16 39/7 39/11 39/13 43/9 43/24 44/1 44/19 45/15 45/21 46/12 56/22 57/21 57/25 58/4 58/8 58/16 58/18 59/13 59/22 59/25
**MS. RIEKENA: [12]** 2/12 19/6 19/9 19/13 38/2 38/23 39/14 51/16 51/24 52/2 52/5 52/15
**THE CLERK: [1]** 2/17
**THE COURT: [102]**

**$**

**$30,000 [1]** 15/7

**'**

**'23 [1]** 17/3
**'24 [3]** 17/3 17/4 17/7
**'25 [1]** 17/3

**-**

**--oOo [2]** 1/3 2/3

**0**

**0315 [1]** 15/1

**1**

**10 [2]** 6/25 8/18
**11 [1]** 8/25
**111 [1]** 1/23
**12 [3]** 5/6 8/25 28/4
**12th [1]** 14/10
**13 [2]** 8/25 26/4
**14 [1]** 9/1
**15 [1]** 9/1
**16 [1]** 9/1
**18 [2]** 26/4 26/16
**19 [3]** 26/5 26/16 35/23
**19th [1]** 59/10

**2**

**20 [2]** 26/5 26/16
**2024 [1]** 21/2
**2025 [8]** 8/12 14/10 15/2 15/4 15/13 15/17 16/10 16/24
**2026 [3]** 1/16 2/1 61/17
**21 [2]** 26/5 26/16
**22 [2]** 26/5 26/16
**23 [3]** 26/5 26/16 26/18
**23rd [1]** 5/3
**24 [5]** 26/5 26/16 26/17 54/23 57/23
**25 [3]** 26/6 26/16 26/17
**26 [3]** 26/6 26/17 26/17
**2s [1]** 16/7

**3**

**3386 [1]** 1/23

**4**

**4-3-3-4 [1]** 34/1
**417 [1]** 9/17
**4:00 o'clock [1]** 45/22

**5**

**50 [1]** 10/20
**50/50 [1]** 10/20

**6**

**675 [2]** 61/7 61/22

**7**

**75 days [1]** 30/1
**7th [1]** 1/23

**8**

**83814 [2]** 1/21 1/24
**8457 [1]** 1/5
**8th [1]** 61/17

**9**

**90 percent [2]** 42/14 42/16
**924 [1]** 1/21

**A**

**ability [2]** 5/1 61/8
**able [22]** 5/8 6/15 7/1 7/4 12/17 12/18 13/16 13/22 16/5 16/16 17/12 23/21 28/1 28/2 28/11 36/9 39/3 39/3 47/25 48/5 48/23 48/24
**about [38]** 7/21 11/5 14/3 19/19 20/9 20/12 21/7 21/9 21/15 28/20 33/17 35/10 35/12 36/19 38/11 39/20 40/2 40/5 41/6 41/16 41/19 41/22 42/9 42/11 42/19 42/20 45/12 48/11 49/21 50/11 50/12 50/13 50/24 55/5 55/17 55/22 57/17 59/3
**above [1]** 61/10
**absolutely [3]** 29/22 43/9 49/4
**abuse [2]** 40/12 47/16
**accept [1]** 23/21
**accepting [1]** 23/20
**access [2]** 7/4 23/21
**accommodate [1]** 46/11
**account [6]** 14/25 15/3 15/7 16/21 16/22 19/14
**accounts [10]** 6/15 7/4 7/6 14/24 15/14 15/19 15/20 16/5 25/5 26/21
**act [1]** 39/1
**actions [1]** 10/22
**actively [1]** 12/3
**activities [1]** 53/24
**actually [5]** 12/20 16/11 20/22 39/9 51/2
**add [1]** 8/4
**added [1]** 25/7
**addition [2]** 4/8 9/19
**additional [8]** 9/10 10/12 10/14 15/10 15/11 20/9 20/21 29/14
**address [4]** 3/3 7/5 58/2 58/12
**adequate [2]** 28/2 28/21
**adequately [3]** 27/20 28/3 28/11
**adjourned [1]** 60/5
**adjusted [1]** 10/19
**Administration [2]** 6/20 6/21
**adversary [2]** 24/9 42/25
**affidavit [1]** 51/5
**affidavits [1]** 36/3
**affirmative [1]** 46/10
**afford [1]** 23/1
**after [11]** 7/25 8/15 9/9 11/20 24/4 27/19 27/19 33/23 33/24 45/20 47/18
**again [33]** 8/4 8/13 8/14 8/14 9/6 10/2 13/11 13/23 16/23 17/25 20/19 21/15 21/21 22/6 22/22 23/16 24/9 26/9 26/17 28/4 28/7 28/19 30/10 30/25 35/17 35/17 35/17 35/25 41/24 42/24 46/3 54/3 57/13
**against [1]** 40/9
**agencies [1]** 5/21
**agree [5]** 6/14 39/21 45/15 56/5 59/9
**agreed [1]** 52/17
**agreeing [2]** 11/2 11/2
**agreement [12]** 33/7 33/10 33/21 36/9 37/1 39/22 43/18 43/22 52/12 52/13 56/6 59/19
**ahead [2]** 11/12 43/25
**ahold [1]** 12/4
**alcohol [4]** 54/10 54/13 54/16 54/19
**all [28]** 8/24 11/8 11/19 14/20 16/18 18/14 25/8 25/20 28/6 29/6 30/7 30/11 31/2 33/17 36/4 37/2 40/8 40/9 40/17 40/17 44/16 47/15 47/15 49/5 52/6 53/21 58/19 59/5
**allow [7]** 13/24 13/25 16/12 30/21 30/21 31/1 44/14
**allowed [1]** 20/13
**alone [2]** 30/20 41/13
**along [3]** 10/25 29/8 42/18
**already [6]** 10/4 18/3 29/1 30/12 44/12 57/22
**also [9]** 3/23 6/3 15/7 18/22 27/22 54/9 55/2 56/17 56/20
**although [2]** 4/8 15/12
**always [3]** 24/8 34/22 49/12
**am [9]** 8/11 14/22 20/1 24/7 49/15 53/6 61/5 61/6 61/13
**AMANDA [1]** 1/4
**amend [19]** 1/13 2/23 2/24 3/2 3/7 3/14 3/15 3/16 3/21 4/6 4/10 4/13 5/10 7/17 10/17 11/14 30/17 31/8 31/10
**amended [7]** 11/3 13/25 24/17 26/3 26/12 30/17 31/15
**amendment [7]** 16/12 26/25 31/1 31/5 31/6 53/7 58/16
**amount [2]** 20/20 29/2
**anecdotal [1]** 35/15
**another [3]** 18/17 50/16 52/14
**answer [7]** 26/3 26/13 27/1 31/15 37/24 46/10 51/22
**answered [1]** 8/24
**anti [1]** 10/25
**anti-efforts [1]** 10/25
**anticipated [1]** 30/23
**any [21]** 4/25 13/16 15/5 15/24 16/6 16/7 16/13 21/25 22/1 22/6 26/6 29/10 31/18 32/13 40/22 43/16 48/10 50/24 55/12 55/17 61/15
**anybody [1]** 56/6
**anyone [1]** 23/3
**anything [9]** 17/10 19/14 20/22 39/10 45/1 45/25 46/6 58/2 58/12
**anyway [1]** 36/3
**anyways [1]** 11/12
**anywhere [1]** 18/2
**apologies [1]** 2/20
**App [5]** 15/16 16/15 18/2 18/3 23/18
**apparently [1]** 30/3
**appear [1]** 29/2
**APPEARANCES [1]** 1/19
**appears [1]** 27/25
**Apple [6]** 15/12 15/12 16/15 18/1 18/3 23/17
**appointment [1]** 32/12
**appointments [4]** 11/5 11/7 32/14 49/24
**appreciate [3]** 31/9 52/6 52/7
**approach [1]** 56/14
**approached [1]** 29/3
**appropriate [3]** 9/25 33/4 36/19
**approved [1]** 50/17
**apps [2]** 6/16 23/18
**April [1]** 15/13
**are [52]** 3/4 6/2 7/5 8/15 8/17 9/19 10/14 10/18 11/3 11/11 11/16 12/24 12/24 15/20 16/17 16/18 20/8 21/23 27/12 27/14 27/15 28/14 28/17 29/17 30/7 30/10 31/23 31/23 32/6 32/7 32/8 32/19 34/8 35/5 35/9 35/22