Steven L. Taggart, Esq., ISB No. 8551
OLSEN TAGGART PLLC
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 552-6442
Facsimile: (208) 524-6095
Email: staggart@olsentaggart.com

*Attorney for Bolton Law, PLLC*

Tecla Druffel, ISB No. 8725
TEC LAW, PLLC
P.O. Box 323
Lewiston, ID 83501
Telephone: (208) 743-9569
Fax: (888) 877-4307
Email: tecla@tec-law.net

*Attorney for Kourtney Jones*

JEFF ANDREWS, P.C.
Jeffrey H. Andrews, ISB No. 4935
8884 N. Government Way Suite "C"
P.O. Box 2246
Hayden, ID 83835
Telephone: (208) 762-5554
Fax: (208) 762-5551
jeffandrewslaw@yahoo.com

*Attorney for Zachary Tannar Riekena*

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| In Re:<br><br>RIEKENA, AMANDA MARIE<br><br>Debtor. | Case No. 26-20041-BRW<br><br>Chapter 7<br><br>**RESPONDENTS' POST-HEARING BRIEF** |

Respondents Zachary Tannar Riekena, Kourtney Jones, and Bolton Law, PLLC (collectively, the "Respondents"), by and through their respective counsel, hereby submit this Post-Hearing Brief based on the evidentiary hearing held on May12th and 13th, 2026 as to Debtor Amanda Marie Riekena's Amended Motion to Enforce the Automatic Stay and For Sanctions (Doc. 37 ) and Respondent's' Motion to Dismiss, Abstain or Retroactively Annul the Automatic Stay (Doc. 55).

## OVERVIEW

The Debtor was losing her case in State Court. On February 2, 2026, after more than a year of refusing to comply with discovery and mandatory disclosures, Idaho Magistrate Judge Walsh granted Mr. Riekena's motion for sanctions and, on the record, identified the property-and-debt paragraphs of the parties' proposed Partial Decree as to which default would apply. Hours later, the Debtor filed Chapter 7. The filing was not refuge. It was retaliation — the centerpiece of a plan the Debtor had telegraphed five months earlier, in her own words, to Mr. Riekena: "Keep your back straight when you have me arrested for filing bankruptcy. . . . Your assets are mine. We go down together." Exh. 242. As the Debtor put it in her own contemporaneous social-media post celebrating the day, she had "pulled an UNO no one saw coming 😉." Exh. 241. This Chapter 7 was an end run around an adverse state-court ruling, deployed to inflict pain on Mr. Riekena and Bolton Law and to undo what Magistrate Judge Walsh had just done on the record.

## ARGUMENT

### I. THE MOTION FOR SANCTIONS SHOULD BE DENIED.

#### A. No Violation of the Automatic Stay Occurred.

The Court is asked to decide two narrow questions on the Sanctions Motion. First, did Ms. Jones (and Bolton Law) — who, at the Magistrate Judge's express direction, reduced the Magistrate Judge's on-the-record ruling to a conforming written order and transmitted it at 12:23 a.m. on February 3 — violate the automatic stay under 11 U.S.C. § 362(a)? Second, if so, what "actual damages" has the Debtor proved under § 362(k) and In re Dawson, 390 F.3d 1139 (9th Cir. 2004)? The answers are no, and none.

##### 1. Magistrate Judge Walsh's Oral Ruling Had Legal Effect When Entered.

*Katseanes v. Katseanes*, 171 Idaho 478, 522 P.3d 1236 (Idaho 2023), is dispositive on the predicate state-law question. The Idaho Supreme Court "affirmatively h[e]ld that oral orders are entitled to the same force and effect between the parties to the lawsuit as an order reduced to writing." Id. at 485. On February 2, 2026, Magistrate Judge Walsh granted the motion for sanctions and identified — paragraph by paragraph — the provisions of the parties' proposed Partial Decree as to which default would apply:

> THE COURT: So default would be granted on paragraphs beginning 18, 19, 20, 21, 22, 23, 24, 25, and 26. And again, as I indicated, I think 24, 25, and 26, and 23, I think that that would just simply not be disputed. That relates to indemnification, revocation of beneficiary, so would enter default on that as well. Twenty-seven, which relates to retirement accounts, and that will be subject to the default. If you'll prepare the order and the default, Ms. Jones. — Tr. of Proceedings, Feb. 2, 2026, p. 26 ll. 15–24 (Exh. 213).

Under *Katseanes*, the Order on Sanctions and the Order Granting Default were effective and operative at that moment — on February 2, hours before the Debtor's petition. To hold otherwise would disenfranchise the family-court judge from her own domain by denying legal effect to a ruling Magistrate Judge Walsh deliberately announced on the record and would invade the state court's authority to manage its own docket and to reduce its own rulings to writing on its own timeline.

### 2. Pettit's Ministerial-Act Doctrine Squarely Covers What Ms. Jones Did.

Federal law confirms what Katseanes supplies. "Ministerial acts or automatic occurrences that entail no deliberation, discretion, or judicial involvement do not constitute continuations" of a judicial proceeding within the meaning of § 362(a)(1). *McCarthy, Johnson & Miller v. North Bay Plumbing, Inc. (In re Pettit)*, 217 F.3d 1072, 1080 (9th Cir. 2000). The Ninth Circuit fixed the inquiry on when deliberation occurred. Once "the judicial proceeding . . . ended" with the operative decision, what follows is ministerial implementation. Id. at 1081.

The First Circuit's decision in In re Soares, cited with approval by the Pettit panel, supplies the touchstone: "when an official's duty is delineated by, say, a law or a judicial decree with such crystalline clarity that nothing is left to the exercise of the official's discretion or judgment, the resultant act is ministerial." *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 973–74 (1st Cir. 1997). Magistrate Judge Walsh's directive — identifying the property-and-debt paragraphs to be defaulted and instructing Ms. Jones to prepare the conforming order — was a judicial decree with crystalline clarity that left nothing to Ms. Jones's discretion. Her reduction of that directive to writing is ministerial under Pettit and Soares.

The Ninth Circuit BAP has applied the doctrine in directly analogous circumstances. In *Tracht Gut, LLC v. Haghnazarzadeh (In re Tracht Gut, LLC)*, 503 B.R. 804 (B.A.P. 9th Cir. 2014), the BAP held that the post-petition recording of tax deeds did not violate § 362 because the tax sale itself was prepetition and the recording was a ministerial act. Tracht Gut also confirms the deference principle that should guide this Court here: "federal courts should pay considerable deference to state law on matters relating to real estate, and where there has been notice to the defaulting party, a substantial lead time before the commencement of foreclosure proceedings, publication of a notice of sale, and strict adherence to prescribed bidding rules and auction procedures, a tax sale is likely to yield reasonably equivalent value for the foreclosed property." Id. at 816. The same deference is owed to the Magistrate Judge's careful, on-the-record management of a fully-joined divorce case — including her decision, after more than a year of the Debtor's discovery noncompliance, to impose default as a sanction with respect to the property-and-debt paragraphs she identified.

**3. The February 3rd E-mail to Chambers Was Disclosure, Not Continuation.**

When Ms. Jones learned of the bankruptcy filing during the morning of February 3, she e-mailed Magistrate Judge Walsh's clerk, Wanda Butler, expressly disclosing the bankruptcy filing and asking the court to consider whether to proceed with the orders that had been submitted the night before. The e-mail did not press for entry. It surfaced the very legal question now before this Court.

That kind of disclosure is not a stay violation; it is the conduct the Ninth Circuit endorses. "Gruntz tells us that a state court has the authority to decide whether its proceeding is within the scope of the automatic stay, but the state court's holding is not entitled to preclusive effect in the bankruptcy court." *Lockyer v. Mirant Corp*., 398 F.3d 1098, 1106 (9th Cir. 2005); *see Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074 (9th Cir. 2000) (en banc). When Ms. Jones asked Magistrate Judge Walsh, via the February 3 e-mail, to determine whether to sign the conforming orders "in light of the Court's oral ruling that predates the notice of bankruptcy," she did exactly what *Gruntz* and *Lockyer* permit — she asked the state court to determine, in the first instance, whether the proceeding was within the scope of the stay. That is the opposite of "continuation."

#### 4. Magistrate Judge Walsh — Not Ms. Jones — Was Calling the Shots on February 4, and Ms. Jones Followed Her Lead.

After Mr. Riadh raised the stay issue on February 4, Magistrate Judge Walsh — and not Ms. Jones — controlled what happened next. The February 4 transcript (Exh. 214) records the Magistrate Judge stating she signed the Order on Sanctions and the Order Granting Default "before receiving the notice of filing"[1]; expressing doubt about the unsworn, unattached notice she had

[1] The record contains some apparent confusion at the judicial level about what was signed. At the February 24 hearing, Magistrate Walsh stated: "So I never signed the partial judgment and decree of divorce, and I never signed the order of default. The only thing I signed was the . . . order for sanctions." Ex. 215, p. 12. Whatever that statement may mean about the operative state-court instruments — a question the Court need not resolve to deny the Sanctions Motion — it underscores that confusion existed even at the judicial level. A careful family-law attorney without bankruptcy

received ("It's not sworn under penalty of perjury and there are no attachments"); declining to sign the proposed Partial Decree; and announcing that the parties' trial would "stay on until then" pending appropriate motion practice and briefing on the stay issue. Ms. Jones followed Magistrate Judge Walsh's lead. She took no further action to enforce the conforming orders, advised Mr. Riadh she would consult bankruptcy counsel, and refrained from any further filings absent advice from bankruptcy counsel or relief from the stay.

By the next state-court hearing on February 24, Ms. Jones had a clearer view of the jurisdictional web. The February 24th transcript (Exh. 215) records her affirmative statement on the record asking the state court to halt all stay-related proceedings until this Court adjudicated the stay issue:

> MS. JONES: Yes, thank you, Your Honor. Mr. Riekena, Bolton Law, and myself are currently facing action by Ms. Riekena in the bankruptcy proceedings, case number 26-20041, alleging violations of the automatic stay pursuant to 11 U.S.C. Section 362, and facing substantial damages therein. My intention in making this record is to ensure we are proceeding carefully in consultation with bankruptcy counsel to avoid violation of the automatic stay. For the record, all parties have retained bankruptcy counsel and have been advised to be mindful of the scope and operations regarding the automatic stay. . . . However, the presiding Judge Wilson's position, and one we take very seriously, is that proceedings should stop until the stay issue is squarely adjudicated, particularly with respect to any request for punitive damages or similar relief. — Exh. 215.

That is the antithesis of "continuation." Ms. Jones used her next state-court appearance to stop the proceeding. No property was seized. No money was moved. No lien was recorded. No exemption was disturbed. No decree of divorce was entered. § 362(k) does not punish restraint[2].

---

practice background cannot fairly be charged with possessing greater clarity on the night of February 2 than the magistrate herself expressed three weeks later.

[2] The Debtor may argue that nothing prevented Ms. Jones from continuing the state-court proceeding because § 362(b)(2) carves out from the automatic stay certain matters "for the establishment or modification of an order for domestic support obligations" and the establishment of paternity, child custody, and visitation. Two answers: First, Magistrate Walsh recognized at the February 4 and February 24 hearings that the property, debt, and custody issues in this divorce were so entangled — fault having been alleged as a grounds for divorce — that the divorce could not

**B. <u>Ms. Jones' Conduct Was Not Willful Under § 362(k).</u>**

**1. The Standard.**

The Ninth Circuit's willfulness standard requires actual knowledge of the bankruptcy filing and an intentional act that violates the stay. *In re Pinkstaff*, 974 F.2d 113, 115 (9th Cir. 1992); *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1214 (9th Cir. 2002). The District of Idaho has stated the standard with care: "[O]nce a creditor or actor learns or is put on notice of a bankruptcy filing, any actions intentionally taken thereafter are 'willful' within the contemplation of § 362(h) [now 362(k)]. The question is thus whether the actor intended the action, not whether the actor intended to violate the stay." *In re Risner*, 317 B.R. 830, 835 (Bankr. D. Idaho 2004). Without actual knowledge, Pinkstaff is not satisfied and § 362(k) does not reach the conduct.

**2. Ms. Jones did not know that the Debtor had filed bankruptcy when she submitted the proposed orders to the State Court.**

Ms. Jones testified that she did not see the Notice of Bankruptcy when it was filed. Her phone call with Mr. Riadh at approximately 5:30 p.m. on February 2 did not include any statement that a bankruptcy had been filed. She then went home, attended to family responsibilities, and worked on the proposed orders from home into the early-morning hours of February 3, transmitting them remotely at 12:23 a.m. Ms. Jones testified that she does not personally receive incoming filings at her firm e-mail; all incoming filings at Bolton Law, PLLC are routed to a centralized "Reception" inbox handled by firm staff. Exhibit 239 — a screenshot of Ms. Jones's Outlook web-browser view, which is the view available to her when working from home — corroborates her testimony: the Reception inbox is not visible in that view. The Notice of Bankruptcy reached the

---

be adjudicated fully and the contested matters largely had to stop pending resolution of the stay. Second, this Court may take judicial notice that the child-custody issues *did* continue to be litigated in state court between the parties — exactly within the § 362(b)(2) safe harbor — without objection from any party here. Ms. Jones acted within, not against, the carve-out.

firm's Reception inbox the evening of February 2; Ms. Jones did not see it until she returned to the office on the morning of February 3.

**3. The Conflict in Testimony Should Be Resolved Against Mr. Riadh.**

Ms. Jones does not dispute that her telephone call with Mr. Riadh at approximately 5:30 p.m. on February 2 occurred. She disputes the content. Ms. Jones testified that what she heard from Mr. Riadh was that the Debtor was considering filing bankruptcy — not that she had filed. Mr. Riadh's account, by contrast, evolved over the two days of trial. On his direct examination on May 12, he did not clearly testify that he had told Ms. Jones a bankruptcy had been filed. He hedged. Only when the Debtor recalled him on rebuttal on May 13 did he sharpen his account to say — for the first time — that he had "absolutely" told Ms. Jones the bankruptcy had been filed. That sharpened rebuttal testimony is difficult to reconcile with Mr. Riadh's own representations to Magistrate Judge Walsh on February 4, made as an officer of the court.

When Mr. Riadh raised the stay at the February 4 hearing, he did so by asking the court a question: "Did the Court see the notice of bankruptcy filing?" Exh. 214 (Tr., Feb. 4, 2026, at 3). He did not say, 'as I told Ms. Jones two nights ago on our call, the bankruptcy has been filed.' He did not represent to the court that he had given any party-to-party notice. His opening framing presupposed that whether anyone in the room knew of the filing was an open question to be addressed in real time — not a settled fact already communicated to opposing counsel.

Moments later, in the same colloquy, Mr. Riadh affirmatively represented to Magistrate Judge Walsh, as an officer of the court, that he himself had no advance knowledge of the bankruptcy filing — and that the Debtor did not even know the bankruptcy lawyer's name until after the morning February 2 hearing:

> MR. RIADH: Judge, I will say as an officer of the court, prior to walking into court, we had not discussed filing bankruptcy or any of that. That was a conversation that

> happened after she was able to get in with a different — I didn't file it. A different attorney filed the bankruptcy, and they — how they got it done in a short time, that's — I couldn't tell you, Judge. That's just between her and Mr. Williams . . . . I'll file an objection based off of the bankruptcy filing, and I'll get more information and also the case number as well. — Exh. 214 (Tr., Feb. 4, 2026, at 5–6).

Magistrate Walsh then asked Mr. Riadh to confirm his representation: “And so the representations here today is that the first time that this bankruptcy attorney was contacted and was filed with the Court — and I'd be very cautious in the answer — the first time that this bankruptcy attorney was conferred with and this decision to file bankruptcy was made after our hearing on February 2nd?” Mr. Riadh answered: “Judge, I will say yes, that is correct. Ms. Riekena did not even know Mr. Williams' name until we talked and she asked me, and I gave her his name.” Exh. 214 (Tr., Feb. 4, 2026, at 6).

Mr. Riadh's February 4th representations bear directly on the weight the Court should give his sharpened May 13 rebuttal account. As an officer of the court, he told Magistrate Judge Walsh (a) that he himself had not known of the bankruptcy plan before walking into the morning February 2nd hearing; (b) that the Debtor did not even know her bankruptcy attorney's name until later that day, when he provided it; and (c) that as of February 4 — two days after the petition was filed — he was still gathering the case number from the docket. It strains credulity to suppose that a lawyer who told the state court on February 4th that he was still gathering the case number from the docket had, less than 48 hours earlier, "absolutely" delivered clear oral notice of the filing to opposing counsel during a 5:30 p.m. phone call. The more natural reading of the two accounts — and the one the contemporaneous record supports — is that on the evening of February 2 Mr. Riadh conveyed, at most, that bankruptcy was being considered, and that his recollection sharpened only later, with the benefit of hindsight and the strategic framing of the Sanctions Motion.

Ms. Jones's own contemporaneous conduct confirms she did not have actual knowledge of a filed petition when she pressed "send" on the conforming orders at 12:23 a.m. on February 3. After the call ended, she went home, attended to family responsibilities, and worked on the proposed orders from home into the early-morning hours, transmitting them remotely at 12:23 a.m. Had she been told at 5:30 p.m. on February 2 that the petition had been filed, that transmission would not have occurred. And there is a mechanical reason Ms. Jones did not see the Notice of Bankruptcy overnight: she testified that she does not personally receive incoming filings at her firm e-mail; all incoming filings at Bolton Law, PLLC are routed to a centralized "Reception" inbox handled by firm staff. Exhibit 239 — a screenshot of the Outlook web-browser view available to Ms. Jones when working from home — corroborates that the Reception inbox is not visible in that view. The Notice of Bankruptcy reached the firm's Reception inbox on the evening of February 2, but Ms. Jones did not see it until she returned to the office on the morning of February 3. Her very next act after learning of the filing was the disclosure e-mail to chambers.

Ms. Jones's account — that she heard from Mr. Riadh on the 5:30 p.m. call only that the Debtor was "considering" filing — is fully consistent with Mr. Riadh's own February 4 officer-of-the-court representations, with the docket timing, and with the mechanical limits of her remote access to firm e-mail. Mr. Riadh's evolving account, sharpened only on rebuttal, is not.

#### 4. Good-Faith Reliance on *Katseanes* Defeats Willfulness Even Assuming Some Awareness.

Even if the Court were to find some level of awareness by the time the conforming orders were submitted, Ms. Jones's contemporaneous understanding of Idaho law — that Magistrate Judge Walsh's oral ruling carried the same force as a written one under Katseanes, and that she was bound to comply with the Magistrate Judge's express direction to "prepare the order and the default" — supplies a good-faith basis for the conduct. A party who in good faith believes the stay

does not reach particular conduct may submit the question to the relevant court without violating the stay. *Lockyer*, 398 F.3d at 1107–08.

### 5. Ms. Jones Conduct Was Proper Under *Urwin*.

The Debtor may argue, as the Idaho bankruptcy court framed the rule in *In re Urwin*, Bankruptcy Case No. 09-01921-JDP (Bankr. D. Idaho 2010), that a party with notice of bankruptcy who continues a collection action in a non-bankruptcy forum "must automatically dismiss or stay such proceeding or risk possible sanctions for willful violations pursuant to § 362[k]." *Urwin* at 12 (quoting *Eskanos & Adler*, 309 F.3d at 1214). Ms. Jones embraces that standard. *Urwin* helps the Respondents on these facts.

### 6. Between February 4 and February 24, the Stay Status Was Genuinely Unclear — and Magistrate Judge Walsh Herself Said So on the Record.

The Debtor's account assumes that Ms. Jones knew, with confidence, on the afternoon of February 4 that the stay was in effect and that the conforming orders were void. The Feb 4 transcript (Exh. 214) does not support that view. Magistrate Judge Walsh expressed her own doubts about the validity of the notice of filing and confirmed she had signed the Order on Sanctions and the Order Granting Default before notice reached her:

> THE COURT: Well, first of all, I got the notice. It's not sworn under penalty of perjury and there are no attachments, so I would just say that. . . . The notice was filed at 5:29 on February 2nd. . . . I signed the order for entry of default, and let's see, before receiving the notice of filing. And again, there is no attachment to that notice. There's not — it's not sworn under penalty of perjury. As I understand it, there's no case attached. Certainly we didn't discuss it at our hearing. It wasn't brought to my attention at the hearing, and so I don't see it as this causes the Court to need to take any further action in this matter until there's appropriate motion before the Court, briefing before the Court, and our trial will stay on until then. — Exh. 214.

In that posture, Ms. Jones's restraint — declining to take any further action, advising Mr. Riadh she would consult bankruptcy counsel, and refraining from further filings absent counsel's advice or relief from the stay — is exactly what a careful attorney should do.

**7. Once the Status of the Automatic Stay Was Clear, Jones Affirmatively Asked the State Court to Stay the Proceedings.**

By the time of the next state-court hearing on February 24, the picture had crystallized: the Debtor had bankruptcy counsel of record; the Opposing Parties had retained bankruptcy counsel; and the Sanctions Motion had been filed in this Court. Ms. Jones used the February 24 hearing to stop the state-court proceeding herself. She opened the hearing by stating, on the record:

> MS. JONES: Yes, thank you, Your Honor. Mr. Riekena, Bolton Law, and myself are currently facing action by Ms. Riekena in the bankruptcy proceedings, case number 26-20041, alleging violations of the automatic stay pursuant to 11 U.S.C. Section 362, and facing substantial damages therein. My intention in making this record is to ensure we are proceeding carefully in consultation with bankruptcy counsel to avoid violation of the automatic stay. For the record, all parties have retained bankruptcy counsel and have been advised to be mindful of the scope and operations regarding the automatic stay. We acknowledge that there are specific statutory exceptions to the automatic stay regarding domestic relations matters, including proceedings for the establishment or modification of an order for domestic support obligations . . . . However, the presiding Judge Wilson's position, and one we take very seriously, is that proceedings should stop until the stay issue is squarely adjudicated, particularly with respect to any request for punitive damages or similar relief. — Ex. 215 (Tr., Feb. 24, 2026, at 3-4).

That is the antithesis of "continuation." Ms. Jones used her next state-court appearance to halt the proceeding, expressly invoking this Court's position and the need to consult bankruptcy counsel before any further step. The *Urwin* defendant earned a stay-violation finding because she "took no further action to stop the legal process, electing to leave matters alone." *Urwin* at 12. Ms. Jones did the opposite. She stopped it herself.

**C. <u>The Debtor has not proved any damages</u>.**

**1. No Economic Injury.**

Section 362(k)(1) requires proof of "actual damages." "Actual" means real, proved, and caused. The Ninth Circuit's controlling decision in *In re Dawson*, 390 F.3d 1139 (9th Cir. 2004),

requires that the harm be "significant," "clearly establish[ed]," and traceable by a "causal connection" to "the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process)." *Id. at* 1149–50. "Fleeting or trivial anxiety or distress does not suffice." *Id.* at 1150. The Debtor articulated no economic injury caused by the submission of the conforming orders. No property was seized. No lien was recorded against estate property. No money moved. No exemption was disturbed. No garnishment issued. No final decree dividing marital property was ever entered — Magistrate Judge Walsh declined to sign the Partial Decree. The Order on Sanctions and the Order Granting Default were procedural orders within a fully-joined divorce case; they did not, by their terms, distribute any item of estate property. The Debtor's own testimony did not connect any dollar of loss to the February 2–3 conduct.

**2. No Competent Evidence of Fees and Costs Incurred.**

The attorneys' fees the Debtor seeks under § 362(k) would be incurred — if at all — by Mr. Williams, who is her bankruptcy counsel. Mr. Riadh, by contrast, is her state-court divorce counsel; he is not bankruptcy counsel of record in this case and has prosecuted no aspect of this Sanctions Motion before this Court. Mr. Williams's record does not satisfy what § 362(k) requires.

The Ninth Circuit's controlling decision on fee recovery under § 362(k) is *America's Servicing Co. v. Schwartz-Tallard* (*In re Schwartz-Tallard*), 803 F.3d 1095 (9th Cir. 2015) (en banc), aff'g 473 B.R. 340 (9th Cir. BAP 2012). *Schwartz-Tallard* overruled the prior, narrower rule of *Sternberg v. Johnston*, 595 F.3d 937 (9th Cir. 2010), under which fees were recoverable only to the extent incurred in ending the violation, not in recovering damages. *Schwartz-Tallard* now allows a debtor prosecuting a willful stay violation to recover all of her reasonable fees incurred in prosecuting the violation, regardless of whether the fees were incurred in ending the violation or in recovering damages. 803 F.3d at 1101. But *Schwartz-Tallard* did not displace the predicate

evidentiary requirement: the debtor still bears the burden of establishing, with competent proof, what fees were actually incurred and that they were reasonable. That predicate requirement is what the District of Idaho articulated in *In re Risner*:

> The actual time spent must be established, through competent evidence in each case and viz each creditor alleged to have violated § 362(a), and that time and the fees charged must be shown to be reasonable. *In re Risner*, 04.4 I.B.C.R. 172, 174–175 (Bankr. D. Idaho 2004) (quoted in *Urwin* at 13).

The record here does not meet Risner's standard. Mr. Williams filed his initial Disclosure of Compensation of Attorney for Debtor pursuant to Local Bankruptcy Rule 2016-1 and 11 U.S.C. § 329 on February 2, 2026. Doc. 6. He later filed an Amended Disclosure on May 7, 2026. Doc. 68. Neither disclosure breaks out the time he attributes to prosecuting the Sanctions Motion as distinct from the general bankruptcy representation. Neither disclosure establishes what amount has been billed to the Debtor for stay-violation work specifically or what amount, if any, the Debtor has paid. In Urwin, the bankruptcy court had to "estimate the legal fees incurred" because the record contained "no affidavits or other proof addressing Debtor's losses or expenses." *Urwin* at 13. Here, the gap is wider: the disclosures Mr. Williams filed (Docs. Nos. 6 and 68] do not break out a discrete "stay-violation prosecution" component, do not isolate hours spent on this Motion as distinct from the broader bankruptcy representation, and do not establish what (if anything) the Debtor has actually paid for this work. Schwartz-Tallard opens the door to fees properly proven; it does not relieve the Debtor of the burden to prove them. The Court should not have to estimate fees that the Debtor's own evidence has not established with competent proof.

### 3. No Compensable Emotional Damages Under *Dawson*.

To recover emotional-distress damages under § 362(k), a debtor must:

> (1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process). — In re Dawson, 390 F.3d at 1149.

Fleeting or trivial anxiety or distress does not suffice. *Id*. "To clearly establish the significant emotional harm, in most cases the debtor will need to corroborate his or her testimony." Id. at 1150. Corroboration is excused only where the violation is "patently egregious" or where significant emotional distress is "readily apparent" from the conduct itself. *Id*.

The Debtor's evidence fails each prong. Much of what she described — sleeplessness, anxiety, financial pressure, concern about her cancer, concern about custody, concern about debt — falls within “the anxiety and pressures inherent in the bankruptcy process” that *Dawson* expressly excludes. 390 F.3d at 1149. Those distresses would have attended this Chapter 7 regardless of what Ms. Jones did or did not do in the divorce case. The Debtor presented no corroborating medical or psychological evidence connecting any specific emotional injury to the February 2–3 conforming-order conduct as distinct from the bankruptcy generally or the cancer diagnosis itself. A pattern in the Debtor's testimony also warrants weight: when asked questions on the stand she did not wish to answer, the Debtor repeatedly redirected to her cancer diagnosis. The Court has obvious sympathy for the Debtor's medical situation. But sympathy is not § 362(k) damages, and Dawson's third prong requires causal proof, not sympathy.

Exhibit 241 — the Debtor's own Facebook post — captures the Debtor and Mr. Riadh walking out of the February 2 hearing, accompanied by the Debtor's own comment to Tasha Walker that "[Tasha Walker] took an L that day and pulled an UNO no one saw coming 😉." The post drew 40 reactions, 9 comments, and 3.9K views. The Debtor was celebrating. A person experiencing the "significant" emotional injury Dawson requires does not, contemporaneously, post a triumphal courthouse-exit video with an emoji-laden taunt to a third party.

Exhibit 242 — the September 15–16, 2025 text thread between the Debtor and Mr. Riekena — is more revealing. In her own words, five months before filing this Chapter 7, the Debtor wrote: "Keep your back straight when you have me arrested for filing bankruptcy. All ten toes. See you there." Two messages later: “It's illegal as f*** to threaten me with charges or have your big dog attorneys do it. Your assets are mine. We go down together.” Hours later: “I've been trying since November while you abuse me through the system. F*** you and Bolton.” The next morning: “I have nothing to lose, you do. My name is on the house and it'll be the first thing to go.” These are the Debtor's own words, in her own hand, five months before she filed. They describe the bankruptcy filing as a weapon — not as refuge — and they reframe the emotional-distress picture the Debtor has asked the Court to accept.

**4. No Predicate for Punitive Damages.**

Even where a § 362(k) violation is established, punitive damages are not available simply because a violation occurred. The Ninth Circuit's controlling decision in *In re Dyer* held that "significant punitive sanctions are not available" under the bankruptcy court's civil contempt authority or its inherent sanction authority, and held that punitive damages under § 362(h) (now § 362(k)) require conduct that rises well above the willfulness threshold. 322 F.3d 1178, 1181, 1192–94 (9th Cir. 2003). Under *Dyer*, even a willful violation does not, without more, support a punitive award. *Id. at* 1193. What is required is "reckless or callous disregard for the law or rights of others," or "egregious, intentional misconduct" — something more than the intentional act and actual knowledge that suffice for willfulness. *Id.* at 1193, 1197.

The conduct here does not approach that bar. Ms. Jones reduced a prepetition oral ruling to a conforming written order at the magistrate's express direction; disclosed the bankruptcy to chambers within hours of learning of it; followed Magistrate Judge Walsh's lead on February 4; declined to press for entry of the Partial Decree; and affirmatively asked the state court on February

24 to halt all stay-related proceedings until this Court resolved the issue. Ex. 215 (Tr., Feb. 24, 2026, at 3-4). That is the opposite of "reckless or callous disregard." It is professional restraint.

On this record, the Debtor has not proved any compensable damages. Not economic harm. Not compensable emotional injury under Dawson. Not attorneys' fees on competent evidence under *Risner* and the post-*Schwartz-Tallard* framework. And certainly not the "reckless or callous disregard" or "egregious, intentional misconduct" Dyer requires before a punitive award may issue. The Court should award nothing.

## II. DEBTOR’S BANKRUPTCY SHOULD BE DISMISSED AS A BAD FAITH FILING.

Bad faith is at the root of the Debtor’s bankruptcy filing on February 2, 2026 that followed mere hours after the Debtor had been sanctioned by the State Court for failure to comply with requirements of the State Court.

But, the origin predates the bankruptcy. The Debtor approached her divorce as war. That is the Debtor's own self-description, in her own words. Exhibit 242 reflects a debtor who, five months before filing, was already planning to use bankruptcy as a weapon: “Your assets are mine. We go down together.” That is not the voice of someone seeking the protection of the federal bankruptcy system. That is the voice of someone planning to deploy it offensively. The Court should weigh that context in three ways.

First, it bears on *Dawson* causation. A debtor who has been planning to file bankruptcy for five months as a tactical weapon does not experience the conforming-order conduct as a thunderclap of new distress, and the contemporaneous record (Exh. 241; Exh. 242) confirms it.

Second, it bears on the equitable considerations under § 362(d). A party seeking discretionary equitable relief — and a fortiori, the punitive sanctions and fees the Debtor seeks — should come to the Court with clean hands. The text-message record does not depict clean hands.

It depicts a debtor announcing, months in advance, that she intended to make Mr. Riekena and Bolton Law "go down" with her, and a Chapter 7 filed within hours of an adverse state-court sanctions ruling. That is end-run timing, not crisis timing.

Third, it bears on the credibility findings the Court must make. A debtor whose own contemporaneous record undercuts her in-court testimony is not entitled to the benefit of doubt on the disputed points. Where the Debtor's account of what Mr. Riadh told Ms. Jones at 5:30 p.m. on February 2 conflicts with Ms. Jones's account, the Court is asked to resolve that conflict against the party whose own words at Exhibit 242 reveal a months-long offensive plan.

**A. <u>The Standard</u>.**

11 U.S.C. § 707(b)(3)(A) allows the Court to analyze a Chapter 7 filing to determine whether it was filed in bad faith.

Bad faith dismissal is appropriate if "the debtor intended to invoke the automatic stay for improper purposes, such as for the sole objective of defeating state court litigation". *In re Mitchell*, 357 B.R. 142, 155 (Bankr. C.D. Cal. 2006)(citations omitted). Or, if the bankruptcy filing is "an attempt to obtain a more favorable outcome in . . . ongoing litigation". *In re Little*, 657 B.R. 873, 877-80 (Bankr. D. Idaho 2024). *See also In re Bootjack Dairy M&D, LLC*, 654 B.R. 368, 386-87 (Bankr. D. Idaho 2023).

One of the clear justifications for finding bad faith is if "the case is essentially a two-party dispute capable of prompt adjudication in state court." *In re St. Paul Self Storage Ltd. Partnership*, 185 B.R. 580, 583 (9th Cir. BAP 1995) (citations omitted).

**B. <u>The State Court's Sanction Triggered the Bankruptcy</u>.**

Both the Debtor and Mr. Riadh, testified on May 12, 2026, that the bankruptcy filing itself was precipatiated and triggered by the decision earlier that day for the State Court to sanction the Debtor for failure to comply with required disclosures. Of note, the Debtor had not talked to any

bankruptcy attorney, according to her own testimony, until after the end of the State Court hearing. She received a decision she deemed unfavorable and filed bankrutpcy to sidestep the State Court's determination.

**C. <u>The State Court Has the Ability to Resolve the Outstanding Issues</u>.**

For instance, the Debtor filed for bankruptcy but claimed no exemptions except for personal property. Exh. 203, pgs. 10-11. She claimed no exemption in the home or her vehicle or even retirement accounts[3]. *Id.*

Under the proposed Partial Judgment & Decree of Divorce (Exh. 210, pgs. 26-37), the Debtor would have received, even after the sanctioning by the State Court, the following:

- Half of one retirement account and 45% of the other, totalling $62,494.64 (*Id.*, pg. 34).
- A 2018 Jeep Grand Cherokee valued between $18,000 - $25,000 (*Id.*, pg. 35.

Both parties had disputed the nature of the home but it has equity over $100,000. See Exh. 203, pg. 3 and pgs. 12-13; Exh. 214, pg. 34. The Debtor claims the home is community property. Her spouse asserts it is his separate property. The State Court, in the hearing on February 4, 2026, was specific that it could resolve the issue but needed more information. Exh. 214, p. 2, ll. 11 – p. 3, ll. 12.

Thus, if the state court resolved the property issues, the Debtor would be ahead personally compared to what would occur in the bankruptcy and conceivably better off if she was entitled to a portion of the equity in the home.

**D. <u>The Debtor Did Not File Bankruptcy for Any Valid Purpose</u>.**

---

[3] The Debtor was specifically asked if she needed to make any amendments to her schedules and testified that she just needed to add some more unsecured claims but made no assertion of unclaimed exemptions.

The schedules and statements support the Respondents' assertion that the purpose of the bankruptcy filing was to interfere with the state court's order of sanction which under this circumstance was determinative as to the division of the marital estate, separate and community. The bankruptcy objective in light of the state court ruling was not offered safe harbor but to yield a different result in the different forum.

The Debtor was not truthful in her schedules or was deceptive or acted with malice toward Mr. Riekena, or just in bad faith. Eleven (11) days passed between the petition date (February 2, 2026) and the filing of the schedules and statements. See Exh. 200 and Exhs. 203-208. There was plenty of time to gather information, inventory and value assets, and prepare and review for accuracy the prior two years of financial information required in the statements, under penalty of perjury.

Nevertheless, the Debtor filed without an eye for accuracy but instead to push an ongoing narrative of victimhood along with a form of retribution against Mr. Riekena or alternatively was forum shopping given the state court sanction ruling.

As the Court Docket indicates the skeletal filing was done on February 2, 2026 with the remainder of her schedules and statements filed on February 13, 2026. *Id*. In her Schedule A/B property she lists her ownership interest in a home and real property located at 2354 Morning Star Road in Post Falls, Idaho but omits the fact that Mr. Riekena had an ownership interest in the property (Exh. 203 at pg. 3). Additionally, on schedule D as to both Citizens Mortgage as well as Spokane Teacher's Credit Union, she marked the box "An agreement you made such as mortgage..." despite not being a promisor on either note (*Id*., pgs. 12-13). On Schedule H (*Id*., pg. 28) she asserts Mr. Riekena is a codebtor but then omits any reference to the Schedule D mortgage lenders despite being directed to do so in the official form leaving blank the identifier "The creditor

to whom you owe the debt check all schedules that apply." The Debtor failed to claim a homestead exemption on schedule C (*Id.*, pgs. 10-11) which is odd (juxtaposition) in the context of her financial condition. Her Statement of Intention indicates her desire to surrender her interest in the home. In short, the theme of the schedule is to disregard Mr. Riekena's ownership interest in the home including his separate property comprised of the sale of premarital residence (Exhs. 232-34) and the gift made from his mother in the purchase of the family home along with his community property interest (Exh. 235). The Debtor's characterization of Mr. Riekena's interest was either not truthful or was intended to mislead.

The Debtor's Schedules and Statements are misleading as to her financial condition when taken as whole.

**1. The Debtors' Asserted Financial Condition.**

The Debtor made it clear throughout her testimony that she had no money, was unable to work and but for "contributions" from family members referenced in her "J" schedule (Exh. 203, pg. 31) she could not survive. It's notable that these contributions then morph into loans on her Schedule F. Albeit there are no specific dates listed as to when each debt was incurred. Additionally, the apparently well healed family member/friend creditors have made loans/advances (totaling $59,500.00). No family member or friend has filed a claim in the case. The Debtor in her testimony could not recall with any specificity when or what each/any "contribution," "loan," or "advance" was for, only that it was ongoing.

**2. The Capital One Credit Card.**

Mr. Riekena testified that in February of 2025 the Capital One credit card that the Debtor used leading to the equalization payment was satisfied and his belief was that any other joint debt or pre-divorce filing debt had been satisfied utilizing the prior Heloc. The Debtor was removed as an obligor upon satisfaction of the balance then owing to Capital One. It is notable that the Capital

One credit card is scheduled (Exh. 106, pg. 12) as a debt to be allocated to Mr. Riekena supporting that assertion. The Debtor testified that the Capital One card was used to pay her January 2025 rent. Mr. Riekena was servicing all expenses associated with the Evening Star property and he reasonabley assumed Debtor was no longer burdened by any revolving lines as of this time period.

**3. Statements of Financial Affairs (Part I).**

Turning to the Statement of Financial Affairs the Debtor indicates that in 2025 she earned $27,433.26. (Exh. 205 pgs. 1-2). On Part IV item 5 the debtor marked the box indicating that she had no other source of income, even though the official form instructs "Examples of other income are alimony, child, support.." The testimony indicated first from Mr. Riekena that he paid child support commencing in March of 2025 in the amount of $1,406.00 per month and stopped paying support when he was granted physical and legal custody of the minor children in October of 2025 ($11,248.00). Additionally, Mr. Riekena was at the same time ordered to pay $500.00 per month in "income sharing" as additional support/maintenance to the Debtor. Mr. Riekena in his testimony was candid and acknowledged that he may be two (2) months behind on this obligation but intended to get immediately current. Assuming he is two months behind, Mr. Riekena, in a light most favorable to the Debtor, paid at least eight months or $4,000.00 in 2025 that did not appear as other income in her statements.

The Debtor as part of her narrative instead asserts at Item 29 of her A/B schedule a claim for Family Support in the round amount of $11,000.00 and describes the same as child support obligations and spousal maintenance (Exh. 203, pg. 7). The Debtor's testimony on this subject was not credible and seemed to imply that there was some vaguely described pending matter in the state court proceeding but otherwise didn't refute Mr. Riekena's testimony.

**4. Medical Debt.**

The Debtor has had health insurance throughout. This is apparent in the way the debt was scheduled. The only medical provider with an identified amount showing owed is Labcorp (Exh. 203, pg. 20 at 4.14) in the amount of $6.03. All other medical providers that are scheduled (Beacon Cancer Center 4.7, Hemisphere Health 4.13, Mindful Recovery Service 4.18, Northwest Plastic Surgery 4.20 are all listed as "unknown" as to amount.

The evidence and testimony indicate that the deductible or max out of pocket is $1,500.00 Exh. 229. The debtor in her testimony indicated that there was some issue with her not having a new insurance card implying that there were large outstanding medical bills unidentifiable as to provider or amount at trial. Her testimony as to the implication is not credible for several reasons: (1) Mr. Riekena was ordered to maintain insurance for her benefit, (2) he still is married and therefore with the marital community intact would continue to have financial exposure from any provider, (3) If Debtor is relying on family members to make ends meet but apparently hasn't taken the time to determine the ends (4) the narrative would assume medical providers would rather look to the insured as opposed to the insurer, (5) the debtor with the assistance of counsel intentionally postured the case as an assets case establishing a premium on accuracy. Eighty-seven (87) days days passed between when the schedules were filed and trial.

While Debtor indicated for the purpose of the narrative, she had bills at home and the schedules were to be amended, as of this date there have been no changes to the schedules or statements despite an unreasonable passage of time . The Debtor was not clear when she had difficulty utilizing the insurance and evidence was submitted (Exh. 231) indicating that insurance was in fact available and being used by the Debtor. Additionally, the debtor indicated in her testimony that she is now co-insured through Medicaid. Therefore, it is unlikely she has any significant medical debt that went uncovered. Contrary to the Debtor's duties in bankruptcy the

narrative took preference over the accuracy and truthfulness of her schedules and statements. If she knew the case would be an assets case special attention should have been paid to the identity and amounts related to the claims process. That was not done.

**5. Debtor's Schedules Revisits.**

The Debtor's income and expenses have significant inconsistencies. She states she has resided at her present address since 11/24 (Exh. 205, pg 1.) She claims reasonable monthly expenses of $3,925 which annually are $49,100.00. She claimed $27,433.26 from employment in 2025. What is omitted but not uncontroverted is that she received an additional $15,248.00 in ordered maintenance income. This totals $42,433.00 leaving an annual shortfall of $6,667.00. Conceding the figure in her statements was likely gross income from employment without tax deductions, the shortfall could be no more than $10,000.00. Nevertheless, the debtor would submit that over the course of the time-period between February of 2025 and February 2, of 2026 that she received from family in the form of "contributions," "advances" or "loans" a total of $59,500.00, non-taxable as asserted ($10,400.00 alone more than annual scheduled reasonable monthly expenses and excluding all other sources of income). When this figure is added to the disclosed income in her schedules along with undisclosed maintenance, she had total income of $101,933 less expenses of $49,100.00 according to her schedules and statements.

The Debtor indicated in her testimony that she did not work after June of 2025. Therefore, if you take her year-to-date income of $27,433.26 and divide that number by six months, the debtor averaged monthly income of $4,572.21. Additionally, Debtor was receiving $1,406.00 in child Support and an additionally $500.00 in income sharing commencing in March of 2025. From March through June at least the debtor had monthly income of $6,478.21. She should not have needed to borrow from family or friends to meet her reasonable monthly expenses during that period. Thereafter from July through October she received a minimum of $1,906.00 per month.

During this same period, she testified that she had to sell her vehicle (2018 Jeep Grand Cherokee *See* Exhibit 106, pg. 10, valued between $18,000.00 and $25,000.00) to make ends meet. In the Debtor's statements (Exh. 205, pg. 4) at Part 7 item 18 the Debtor does not disclose this sale. She does indicate she traded a cell phone establishing the concept of sale or transfer came up in the preparation of the statements. Therefore, the Debtor had a source of additional undisclosed revenue. Given that the value of the vehicle may have exceeded the exemption the disclosure may have assisted the trustee in the process of administrating the estate.

Again, the Statements and related documents have not been amended.

**6. The Timing of The Filing Does Not Make Sense Given the Debtor's Financial Condition and Circumstance.**

The filing was tailored in content and timing to defeat the state court order and not provide the debtor a meaningful fresh start. There were no significant collection actions being undertaken by any creditor. The debtor indicated that she was or is considering filing a claim for Social Security Disability and is unable to work. With the exception of a potential defamation lawsuit (Exh. 203, pg. 7, Item 33) any asset or interest in property that she scheduled was exempt or could have been exempted from attachment or execution at state law including retirement accounts along with any claimed interest in the home and real property. She has no wages to garnish. The Debtor was seeking a different result in bankruptcy that she had been afforded in state court.

The timing of the filing is curious and sets her up to fail given the categories of debt she scheduled. Her attorney fees are ongoing in the state court proceeding after February 2, 2026, which could be financially significant. According to her schedules, the Debtor continues to receive contributions from family and friends of at least $3,925.00 per month. Until her medical condition is resolved, there are potential medical expenses especially considering that the divorce would likely terminate Mr. Riekena's obligation to maintain health insurance for her benefit.

In short, given her financial narrative the timing did not set her up to succeed but instead to go right back into debt. If a "Fresh Start" is/was the objective and your assets and income are exempt from attachment and you are represented by counsel, the prudent financial choice is to wait out the stated recurring obligations until your medical and financial condition has stabilized and then file.

**7. The Debtor's Failure to Claim an Exemption on the Evening Star Property and the Retirement Accounts are Inconsistent with Fresh Start Principles.**

If the Debtor really believed she had an interest in the Evening Star Property she would have claimed a homestead exemption. Assuming she has an (undisputed) interest, claiming the exemption would have allowed her to exempt any sale proceeds, if any, to which she may be entitled up to the statutory amount. She could proceed to discharge all F schedule debt. She could elect to repay whomever she chooses after the bankruptcy from the proceeds realized. The Debtor may then have a resource that would allow self-reliance while her social security claim is pending relieving both her and her support network of obligation. The analysis remains the same regardless of the amount realized.

There was no justification in failing to claim an exemption on the retirement accounts. The Debtor likely believed that Mr. Riekena's retirement accounts would serve as the backstop in the event the trustee determines to abandon the estates interest in the home.

**8. Conclusion.**

The Debtor swore to the accuracy of the Schedules and Statements. She refused to be pinned down on whether she intended to amend her schedules and statements and if so which ones. She has had almost three months to make any changes which may explain the state court outcome. The Debtors Schedules Statements demonstrate a lack of candor and are likely false. For Example, it is unlikely she needed to or did borrow the sums of money she states from family and friends.

If it was, it was not born of necessity. The financial data does not support the Debtor narrative. She was held accountable for her conduct in state court and seeks a redo in bankruptcy.

This brings up a final point. The impact of the Debtor's bankruptcy is to deprive her spouse of the home where he is raising their daughters, depriving them of a home. If successful, the Debtor will repay her family and friends and her lawyers but leave her children and spouse without a home. Of note, in the text echange dated September 15, 2025, the Debtor threatened to do exactly that. See Exh. 242.

## III. IN THE ALTERNATIVE, THE COURT CAN ABSTAIN OR RETROACTIVELY ANNUL THE AUTOMATIC STAY.

As previously briefed, the Court can abstain. The Respondents believe that is a viable approach.

The Debtor's pre-trial memorandum argues that retroactive annulment is "an extremely rare remedy governed by the Fjeldsted factors" and that the equities favor her. [Dkt. No. 63 at 10–11, citing *In re Fjeldsted*, 293 B.R. 12 (9th Cir. BAP 2003)]. The Court does not reach *Fjeldsted* unless it first concludes a violation occurred — and for the reasons in Section I, no violation occurred. If the Court does reach Fjeldsted, the equities support annulment. The twelve factors are "a framework for analysis and not a scorecard," and any single factor may "so outweigh the others as to be dispositive." 293 B.R. at 25. On the most salient factors:

- **Debtor's overall good faith.** Exhibit 242 reveals a pre-formed intent to file bankruptcy as a weapon against Mr. Riekena and Bolton Law. That is not good faith.
- **Whether Respondents had actual knowledge.** At 12:23 a.m. on February 3 — when the conforming orders were submitted — Ms. Jones did not. See Section I(B)(2).
- **Whether Respondents proceeded after learning.** Ms. Jones disclosed to chambers within hours of learning, followed Magistrate Judge Walsh's lead on February 4, and affirmatively

asked the state court to halt all stay-related proceedings on February 24 (Exh. 215). That is the opposite of "proceeded."

- **Prejudice / ability to restore status quo.** There is no prejudice to undo. No property was seized; no money moved; no final decree issued. The status quo ante is the status quo.
- **Judicial economy.** A narrowly tailored annulment would clarify the legal status of the conforming orders without disturbing the bankruptcy administration.

On the totality of *Fjeldsted*, the equities support annulment — not denial of annulment — if the Court reaches the question.

**CONCLUSION**

The May 12th and May 13th hearings undermined the Debtor's argument for being awarded damages related to the automatic stay. The Debtor was simply trying to block the State Court's actions to discipline her, not seek appropriate bankruptcy relief. And, the Debtor has shown no awardable damages.

Debtor's Chapter 7 filing amounts to a bad faith filing, primarily designed to block a state court's order of sanction. That is inappropriate use of the bankruptcy process, justifying dismissal.

In the alternative, the Court can abstain and allow the state court to move forward to enforce its determination that the Debtor should be sanctioned. Or, retroactively annul the stay.

DATED: May 27, 2026

OLSEN TAGGART PLLC

*/s/ Steven L. Taggart*
STEVEN L. TAGGART
*Counsel for Bolton Law, PLLC*

TEC LAW, PLLC

*/s/ Tecla Druffel*
TECLA DRUFFEL
*Counsel for Kourtney Jones*

JEFF ANDREWS, P.C.

*/s/ Jeff Andrews*
JEFF ANDREWS
*Counsel for Zachary Tannar Riekena*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of May, 2026, I electronically filed the Respondents' Objection to Amended Motion to Enforce the Automatic Stay and for Sanctions with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent by electronic transmission to all registered participants in this case through the Court's CM/ECF system, including the following:

Christopher S. Williams
Attorney for Debtor
Service@KootenaiBankruptcy.com

United States Trustee
ustp.region18.bs.ecf@usdoj.gov

Timothy R. Kurtz
Chapter 7 Trustee
trk@kurtztrustee.com

Safa Michael Riadh
safa@lawyercda.com

DATED: May 27, 2026

*/s/ Reena Lyon*
Reena Lyon
Legal Assistant